```
 1                      UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2

 3       ------------------------------------------------------------
                                       )
         United States of America,     )   File No. 20CR207
 4                                     )        (JRT/HB)
                 Plaintiff,            )
 5                                     )
         vs.                           )   Minneapolis, Minnesota
 6                                     )   February 9, 2021
         Romelle Darryl Smith,         )   11:07 A.M.
 7                                     )
                 Defendant.            )
 8       ------------------------------------------------------------

 9
         BEFORE THE HONORABLE MAGISTRATE JUDGE KATHERINE M. MENENDEZ
10                     UNITED STATES DISTRICT COURT
                             (DETENTION HEARING)
11

         APPEARANCES
12        For the Plaintiff:          United States Attorney's Office
                                      SARAH HUDLESTON, AUSA
13                                    300 South Fourth Street
                                      Suite 600
14                                    Minneapolis, MN 55415

15        For the Defendant:          Mitchell, Bruder & Johnson
                                      GLENN P. BRUDER, ESQ.
16                                    9531 West 78th Street
                                      Suite 210
17                                    Eden Prairie, MN 55344

18        Court Reporter:             KRISTINE MOUSSEAU, CRR-RPR
                                      300 South Fourth Street
19                                    Box 1005
                                      Minneapolis, MN 55415
20

21

22
              Proceedings recorded by mechanical stenography;
23       transcript produced by computer.

24

25
```

1                        **11:07 A.M.**

2

3              **(In open court via video conference.)**

4              THE COURT:  All right.  Good morning, everyone.

5     We are here for a reopened hearing related to detention in

6     United States versus Romelle Smith, 20CR207.

7              Mr. Smith, can you see me and hear me okay?

8              THE DEFENDANT:  Yes, ma'am, I can.

9              THE COURT:  If at any time you can't see or hear

10    either myself or anyone who is speaking, I want you to get

11    our attention.  Wave your arms or interrupt.  It's

12    important that you be able to hear our proceeding.

13             Do you understand?

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  Okay.  Good.  Let's get appearances

16    on the record.  First on behalf of the United States.

17             MS. HUDLESTON:  Good morning, Your Honor.  Good

18    morning, everyone.  Sarah Hudleston on behalf of the United

19    States.

20             THE COURT:  Welcome, Ms. Hudleston.

21             And here on behalf of Mr. Smith?

22             MR. BRUDER:  Good morning, Your Honor.  My name

23    is Glenn Bruder, and I'm appearing on behalf of the

24    defendant this morning.

25             THE COURT:  All right.  Great.  Welcome,

1     Mr. Bruder.

2          Mr. Smith, before we talk about the motion that

3     has been filed on your behalf to reconsider the issue of

4     detention, we need to address the fact that we are together

5     on Zoom instead of an in-person appearance in a courtroom.

6          We are here on Zoom, as you know, because there

7     is a pandemic going on, and the Court is trying to take

8     steps to keep that pandemic from spreading within the

9     community, within the courthouse and trying to keep it from

10    spreading within the jail, and for that reason, we are

11    having as many appearances as possible by Zoom.

12         You have the right to have this appearance in

13    person if you wish, but it could be several weeks before we

14    can safely arrange to have the appearance in person, or if

15    you would like to go ahead right away, we can do that, but

16    it will have to be by Zoom.

17         Would you like to proceed today by Zoom or wait

18    until we can do this safely in person?

19         THE DEFENDANT:  I would like to resume today by

20    Zoom.

21         THE COURT:  Okay.  So we are going to go ahead

22    today with the video conference hearing.

23         Mr. Bruder, let me have you go first, but first

24    let me say that I find specifically and found that

25    circumstances are changed enough for Mr. Smith that there

1   is no question for me that it satisfies the statutory

2   requirement of reopening a detention consideration.  I also

3   think it's not entirely clear when someone waives their

4   opposition to detention but notes that they're hanging onto

5   the hearing for future reference that that same threshold

6   has to be established, but we don't need to get into that

7   debate here because I find that the fact that when

8   Mr. Smith had his initial and his first appearance, he had

9   a DOC hold, that is now lifted, and he had bail in Hennepin

10  County which was a barrier.

11      The fact that both of those things have changed

12  is adequate to reopen the detention consideration.  So now

13  I think we switch back to a place where the government

14  bears the burden of establishing that there are no

15  combination of conditions and that a presumption applies, I

16  believe, given that this is an ACCA case, but I will allow

17  you to talk about that.

18      Why don't you go first, Mr. Bruder?

19      MR. BRUDER:  Thank you, Your Honor.  In light of

20  the Court's findings, I'm going to limit my argument to the

21  bail issues themselves, the substantive issues, and in the

22  defendant's motion to set bail, I provided the Court with

23  what I thought was a relatively detailed discussion of the

24  applicable standards and the statutory factors.

25      And I would just highlight a couple of things

1    with respect to that, Your Honor.  First of all, with

2    respect to the nature and circumstances of the crime

3    charged, I don't want to denigrate the importance or the

4    seriousness of a felon in possession of a firearm, but I

5    think the Court should be cognizant of the fact that

6    Mr. Smith wasn't arrested in the commission of an offense

7    or threatening anyone or even that law enforcement had

8    focused on him as somebody that they were concerned about.

9         He was in fact mistaken for somebody else while

10   he was a passenger in a car.  He was found.  He was,

11   according to the police, in possession of a firearm, but

12   even if you look beyond the bare circumstances of that

13   report, there is no indication that Mr. Smith threatened

14   anybody or that he was violent or even that he was

15   uncooperative.

16        And in this case, I think a substantial

17   consideration here and resolution of the case is likely

18   whether or not that stop was lawful.  Now, you don't need

19   to address that today, but it certainly is a case that is

20   something far from an open and shut one.

21        Beyond that, Your Honor, looking at the

22   defendant's history and characteristics, and I suspect

23   that's where the government is going to place a substantial

24   emphasis in its argument today, Ms. Hudleston I anticipate

25   will argue that Mr. Smith is both a flight concern and

1     poses a danger to the community.

2          And sometimes we say that, you know, appearances

3     can be deceiving, and usually we mean that somebody has or

4     conveys a great appearance, but really underneath, say if

5     it's a family that looks perfect, they're wholly

6     dysfunctional.

7          But in this instance I would say that it's almost

8     the exact inverse of that, that on the surface it's very

9     easy for Ms. Hudleston to argue that the defendant poses a

10    flight risk because he was on parole and left for Illinois

11    at a time shortly before his arrest, or that he poses a

12    danger to the community because Mr. Smith has prior

13    convictions for a violent offense.

14         But I would suggest to the Court that in fact if

15    you look a little bit deeper at the circumstances, then in

16    fact the appearances can be a bit deceiving here.  For

17    example, the flight risk, yes, Mr. Smith did leave

18    Minnesota without his parole officer's permission while he

19    was on parole for a prior offense, but the motivation for

20    his leaving was because his mother was hospitalized in

21    Illinois and it was an emergency situation.

22         And after the defendant's mother recovered, he

23    immediately returned to Minnesota, and in fact was arrested

24    in this state.  Mr. Smith has connections only with two

25    states in this country, Illinois and Minnesota, and

1    certainly if he were released under a set of conditions,

2    the Court could assure that he remains in Minnesota pending

3    trial.

4           The second consideration relies on Mr. Smith's

5    convictions in either Illinois or Minnesota.  Now, the

6    Illinois convictions, Your Honor, were some time ago when

7    Mr. Smith was much younger.  The Minnesota conviction was

8    more recent, but I think it's worth noting that when

9    Mr. Smith completed that sentence and was discharged in

10   2019 he has not had any subsequent violent encounters with

11   the police or anyone else.

12          He did have two non-felony charges during that

13   period.  One was a property offense, and the other one was

14   for possession of a BB gun, which for anybody else in the

15   world wouldn't be a crime.  So under the circumstances, I

16   would suggest that the fact that Mr. Smith was in the past

17   convicted of an offense that I can't characterize as

18   anything other than a violent offense doesn't mean that he

19   is inherently dangerous or poses a danger to the community,

20   that in fact his behavior in the year or so that he was out

21   of prison suggests that he is not in fact a danger to the

22   community.

23          I also anticipate the government will pay a

24   significant amount of attention to the ACCA connection or

25   nexus with this particular prosecution, but I think that's

1       premature.  You know, an ACCA -- I can't even say it.  An

2       ACCA designation is a complex question.  In this case, it

3       relies on the Court's characterization of offenses

4       committed in another state, and it is wholly premature at

5       this point to say that Mr. Smith is or is not subject to

6       the ACCA.

7              I think that's the other significant issue in

8       this case beyond the stop of the vehicle.  So --

9              THE COURT:  Mr. Bruder, are you suggesting that

10      case law indicates that the two vehicle high-jackings might

11      not qualify, or are you just raising the more theoretical

12      point that it's always a difficult question whether someone

13      is ACCA?

14             MR. BRUDER:  Certainly the latter but also the

15      former, Your Honor.  My understanding from beginning to

16      look at the decisions in that circuit is that there are two

17      different car-jacking portions of the statute in Illinois,

18      and I believe it depends on which subdivision Mr. Smith was

19      convicted of whether or not it's labeled a crime of

20      violence or not.

21             Now, I have to admit we're so far early in this

22      case that I have some concerns about making those

23      representations or arguments to the Court.  I want to leave

24      it at, I want to leave it at this, that it's just premature

25      really until the sentencing phase of the case to conclude

1      that he is subject to the ACCA and use that as the sole

2      basis for denying him bail.

3                  THE COURT:  Can I also ask, you talked about a BB

4      gun.  Are you, I just want to make sure that I'm

5      referencing the proper thing in the criminal history.  Are

6      you saying that the arrest on July 29th of 2019, there was

7      no weapon other than a BB gun?

8                  MR. BRUDER:  That's my understanding.  I have to

9      turn around to look at the bail report, which is sitting on

10     my desk.  If I could do that, Your Honor?

11                 THE COURT:  Yeah.  Yeah.  Actually, Mr. Bruder,

12     why don't you go ahead and finish your comments, and you

13     can take time to check on that while we're listening to

14     Ms. Hudleston and preparing for your next response.

15                 MR. BRUDER:  All right.  And I think, Your Honor,

16     that to address the BB gun, my understanding was that that

17     was a BB gun.  It's a gross misdemeanor offense under

18     Minnesota law for Mr. Smith to be in possession of a BB

19     gun.

20                 That's why it wasn't charged as a felony offense,

21     but I have to confirm that by looking at the bond report.

22                 THE COURT:  My concern is that Count 2 is charged

23     as a gross misdemeanor, and it does allege a BB gun.  Count

24     1 appears to be charged as much more of a traditional

25     possession of a firearm, pistol/assault weapon.  That is

1    charged as a felony.  Maybe the government can shed some

2    light.

3              Go ahead.  You can continue with your comments.

4              MR. BRUDER:  In any event I believe the crucible

5    issue is whether or not there is a condition or any series

6    of conditions which can assure public safety and minimize

7    the notion of the defendant being a flight risk, and

8    certainly there are a number of those, and I think one of

9    them was in fact suggested by the latest addendum that was

10   provided by court services, which I just read earlier this

11   morning.

12             The probation officer interviewed Mr. Smith's

13   sister who suggested that he would profit from some sort of

14   chemical dependency treatment and believes that a lot of

15   his issues and involvement with the law are tied together

16   in chemical dependency and mental health issues.

17             And certainly if the Court were to release --

18   were to order Mr. Smith to participate in a chemical

19   dependency program and tie his release to a bed becoming

20   available, that would virtually assure that he would not

21   pose a flight risk and that he would not present a danger

22   to the community.  So that is also an alternative that is

23   available to the Court.

24             I should mention that early on in this process,

25   Mr. Smith suggested that he felt there was a, that he had a

1    female friend who would be willing to house him.  I did

2    speak to her, and she indicated to me that she was not

3    willing to accept Mr. Smith.  So I think that that opens up

4    the door to other housing alternatives that may in fact

5    offer greater security.

6         THE COURT:  One last question for you,

7    Mr. Bruder, before I turn to Ms. Hudleston:  You indicated

8    that when he was arrested, it was, you believe, a result of

9    a mistake on the part of law enforcement.  They were

10   looking for someone else, believed he was someone else.

11        You also indicated that he was arrested not

12   committing any other crime.  It is true that he has not

13   been charged with any other crime, but am I mistaken or am

14   I correct in recalling that he was actually arrested in a

15   vehicle with a not insubstantial amount of, I believe,

16   methamphetamine packaged for sale?

17        MR. BRUDER:  The short answer to your questions,

18   Your Honor, are, number one, on this one I'm absolutely

19   certain.  He was arrested because they were looking for

20   somebody else.  He wasn't the focus of any police search.

21   They weren't looking for Mr. Smith.

22        They didn't know who he was in fact until after

23   the vehicle was stopped and he was identified by police

24   officers.  With respect to the second question that you

25   posed, the reports indicate that, yes, in fact, there were

1    controlled substances found in the car.  However, they were

2    found -- he was not the driver.  He was not the owner of

3    the car.

4         The controlled substances were found in, you

5    know, the console area of the vehicle, so they were not

6    visible to anybody inside the car, a passenger such as

7    Mr. Smith, and I think the other interesting thing is, this

8    particular vehicle, if you look at the video, had in fact,

9    the police said it had been searched countless times before

10   because panels were ripped off inside and apparently the

11   driver and owner of the vehicle had on numerous prior

12   occasions also had his vehicle searched at times when

13   Mr. Smith was nowhere around by law enforcement

14   authorities.

15        So the inference that I would draw from that is

16   that if anyone owned the narcotics, it probably wasn't

17   Mr. Smith, and I don't think it's really part of this case

18   because he hasn't been charged with an offense as a result

19   of it.

20             THE COURT:  Thank you.  That's very helpful.

21             Ms. Hudleston?

22             MS. HUDLESTON:  Thank you, Your Honor.  I'll

23   begin with just addressing Your Honor's point at the

24   beginning about the reopening of the hearing and, yeah, I

25   would just like to state by way of explanation and not

1    excuse, because it's certainly not an excuse, I was not the

2    attorney for the government who handled the original

3    detention hearing and I think may have had a little

4    misunderstanding, but I do agree that it might be a

5    different calculus if defendant asked to essentially leave

6    the detention hearing for later rather than have a full

7    hearing and reopen.

8           So I agree that it makes sense to have the

9    hearing now, that the conditions regarding the DOC hold

10   have changed.  Of course I do not think that changes the

11   result at all, and the, you know, the issue here, the issue

12   of release and risk and community safety, risk of flight

13   and community safety, I think these issues have been well

14   briefed for the Court.

15          I don't want to repeat everything that's been

16   filed in our memoranda, but I will address what Mr. Bruder

17   has discussed today and just begin by saying, you know,

18   we've got the presumption and we've got themes that really

19   leap out from this record of violence, of instability, of

20   failures to appear, of probation violations, just the kind

21   of things that we look for in detention hearings about

22   whether someone can be released.

23          And I submit in this case, Your Honor, the record

24   simply is well beyond clear and convincing that there is a

25   danger to the community and well beyond the preponderance

1    that there is a risk of flight.  As Your Honor can read

2    from the government's papers, we've got all the 3142(g)

3    factors or many of them strongly supportive of detention.

4            Mr. Bruder began with the nature and

5    circumstances of the offense charged, and I didn't -- it is

6    clear that Mr. Smith was not the target of this

7    investigation.  Law enforcement reasonably believed he was

8    the suspect in, in the (indiscernible due to audio

9    malfunction) and that was based on phone pings.

10           So they are following, and they have reasonable

11   belief tied to the suspect J. R., and the phone is pinging

12   as they see these two men from a distance.  They talk about

13   being at a distance.  They think it's him.  They track the

14   car down and end up finding Mr. Smith.

15           So, yes, he wasn't the target, but that certainly

16   doesn't change the fact that he is a multi convicted felon

17   of serious violent crimes.  He had a gun in his pocket, and

18   the police reports demonstrate that just moments before the

19   car was pulled over, a different officer following those

20   pings and following the descriptions had seen, had pulled

21   up to a gas station and seen who he described later to be

22   known as Mr. Smith get out of the car.

23           And he said that after his 15 years of drugs and

24   narcotic work is something he knew to be concluding a drug

25   deal.  That was just before this car was pulled over where

```
 1    Mr. Smith was found with a gun in his pocket and there were

 2    16 grams of methamphetamine in the car.  The nature of this

 3    offense is more than just a simple mistaken identity and

 4    then found with a firearm.

 5              THE COURT:  I'm going to ask you to pause for

 6    just one moment.  You have attached as Exhibit A -- I just

 7    want to make the record on this exhibit -- as Government's

 8    Exhibit A, the police reports.  Obviously police reports

 9    are just police reports.  They're not a conviction or

10    anything else.

11              Did you attach this to your memorandum, or are

12    you submitting it as a court exhibit?

13              MS. HUDLESTON:  It was attached to my initial

14    memorandum, and I would like it also considered today.  I

15    mean, I guess I understand it to be part of the record

16    already, but because I didn't file it on ECF due to the

17    nature of the --

18              THE COURT:  Of course.

19              MS. HUDLESTON:  -- information, maybe I can just

20    move to admit it for purposes of this hearing as well.

21              THE COURT:  I think that's a good idea.  I was

22    going to treat the submission as a request to admit it.

23              Mr. Bruder, not asking you by any means to agree

24    to the significance that Ms. Hudleston attaches to the

25    information in the police report, but just to its
```

1    admissibility, do you have any objection?

2            MR. BRUDER:  Particularly under the recent

3    circumstances, Your Honor, I don't object to the

4    admissibility of these documents.  I would like to be heard

5    about the allegations briefly in rebuttal, however.

6            THE COURT:  Of course.  And I will just note that

7    the evidentiary gatekeeping rules that apply more robustly

8    at trial and even at motion hearings apply with less force

9    at a detention proceeding like this, so I will admit the

10   exhibit for today's purposes only and allow each side, of

11   course, to argue what weight should be attached to it.

12           And you can proceed, Ms. Hudleston.  Thank you.

13           MS. HUDLESTON:  Thank you, Your Honor.  As to the

14   weight of the evidence, there is compelling multiple

15   different video camera displays of Mr. Smith being taken

16   out of the car, saying something to the effect, I have

17   something there and having a gun pulled out of his pocket,

18   so very compelling evidence.

19           As to his history and characteristics, Mr. Bruder

20   said, you know, look, appearances can be deceiving.  This

21   is something where, you know, it looks like he's a flight

22   and a danger but he's not, and this is not, you know, one

23   sole fact we're looking at, Your Honor.

24           This is a long history, a multifactorial long

25   history of, we've got shootings.  We've got multiple

1    car-jackings, drug use which, you know, is very apparent

2    from the record but yet was not disclosed to probation

3    initially.  Failed drug treatment.  Failed or didn't comply

4    with drug treatment.

5           We've got his sister saying he needs mental

6    health treatment.  We've got a robust record that is really

7    a long history of, history and characteristics, that

8    suggest detention really is necessary here, and that's what

9    we have to go on.  That's what the Court must use.

10          It is not just one little fact that might, you

11   know, give a false impression.  This is the history we have

12   to base the decision on.  Again, I don't want to repeat

13   everything in my brief, so I will try to address

14   specifically what Mr. Bruder has mentioned this morning.

15          Regarding leaving to Chicago and that being the

16   basis of the violation, Mr. Smith did return to Minnesota,

17   of course, but it's not like he went straight to his

18   probation officer and said, I'm so sorry, I had to go, my

19   mother was ill.  He was out driving around with a gun in

20   his pocket and drugs in the center console being observed

21   in what was a suspected drug deal.

22          With regard to the prior convictions, Mr. Bruder

23   said, well, you know, in the Illinois convictions he was

24   younger, and that's true, but he did spend quite a bit of

25   time in prison serving for those convictions.  Then came to

 1    Minnesota and got another violent felony, and while he

 2    didn't have any additional, Mr. Bruder said no additional

 3    violent felonies after he was released in 2019, if we take

 4    a look at the bond report and his record after release, in

 5    that second degree dangerous weapon felony conviction for

 6    shooting a woman in the stomach, we see that he has got

 7    discharged from Pursuit Home health for allegedly selling

 8    methamphetamine, positive AU for amphetamine, cocaine and

 9    marijuana.

10          I'm on page 3 of the bond report, Your Honor,

11    moving on to page 4.  Failed to maintain contact.  Failed

12    to provide UA as directed.  Failed to remain law abiding.

13    Failed to comply with the chemical dependency and after

14    care.  Parole violation hearing and then released for

15    programming.

16          Then again about less than a month later, maybe

17    15 days later, warrant issued.  Failed to maintain contact.

18    Failed to provide UA as directed.  Failed to comply with

19    chemical dependency programming, and the warrant is

20    returned, and then there is the parole violation hearing,

21    and he is released to programming again.

22          Then a day later the defendant left the

23    programming facility.  Warrant issued.  Failed to maintain

24    contact.  Failed to report police contact.  Failed to

25    comply with chemical dependency programming.  Another

1    warrant is issued.  Parole violation hearing, 70 days jail.

2    Two months later, a warrant is issued, and he is released

3    to a sober house.

4         Defendant absconded from the facility.  Warrant

5    issued.  Parole violation hearing.  Released.  Warrant

6    issued.  Absconded from supervision.  Warrant returned.

7    Detained.

8         So that's the record 2019 into 2020 that leads us

9    right up to the month before he is arrested in this case

10   with a gun, and again, this is a conviction, the one, the

11   one I'm referring to at base of all of that follow-up where

12   the description describes the victim lying on the ground

13   with a gunshot wound and said she was hanging out in her

14   apartment when the defendant showed up.

15        An argument ensued.  He was upset that the T E

16   had left him for a woman, the victim, and so he said

17   something to the effect of, I'll kill you b-i-t-c-h and

18   then shot her at close range in the abdomen.  So this is

19   our recent record that we're going on.

20        Now, as far as the ACCA, Your Honor is more than

21   well positioned to take a look and see what the Court

22   thinks about whether those statutes do indeed qualify under

23   current case law, but I submit, Your Honor, that's not

24   really the issue here.  I think it does, it does certainly

25   bolster the fact that this is a very serious case, the fact

1    that this is a case that involves multiple violent

2    felonies.

3         But irrespective of that designation, very high

4    guidelines are at play.  There is the same motivation in

5    terms of risk of flight with the, facing a significant jail

6    time, and the, you know, all of the factors at play here

7    are going to be there really whether or not this is an ACCA

8    case.  So the same concerns for community safety.  The same

9    concerns for risk of flight.

10        And, you know, we've learned today that now the

11   woman most recently designated by Mr. Smith as a place to

12   live is not willing to accept him, and there is just no

13   sufficient guarantees if he is released to a halfway house

14   that he won't flee.  His record shows that he has failed to

15   abide by treatment, failed to abide by the rules of such

16   facilities where release is often like the programming in

17   the facilities, and there is just simply not sufficient

18   guarantee of community safety and of securing his

19   appearance for the future of this case given everything in

20   the record.

21        And, Your Honor, I think the fact that, you know,

22   certainly the tools for assessing pretrial risk are

23   imperfect, certainly, but the fact that he is a Category V

24   does speak volumes here.  He has used apparently five

25   aliases.  He has had a lot of drug problems.  There is just

1    a replete record that shows that there are no conditions

2    and that the bail reform 3142(g) factors are met even if

3    this were an initial hearing and not a reopened hearing.

4            Thank you, Your Honor.

5            THE COURT:  Ms. Hudleston, do you have any -- I

6    have two factual questions for you, and if you don't have

7    information beyond the bond report, that's okay.  I have

8    closely studied the bond report here.

9            The first question is, are you aware of when

10   Mr. Smith was released from custody on the second

11   aggravated vehicle high-jacking with a firearm?  He was

12   sentenced to eight years in 2011.  The first indication we

13   have of any contact with law enforcement is a domestic

14   assault that was dismissed in the end of 2015.  That means

15   he was out at least by then.

16           Do you know when he was released from prison on

17   the 2009 Cook County case?

18           MS. HUDLESTON:  I'm afraid I don't, Your Honor,

19   and now that we're looking at this, that reminds me that I

20   think there was something in the criminal history, and

21   maybe Mr. Bruder can speak to this if he knows when he was

22   released, but I recall that there was something I think

23   where maybe he was resentenced to the eight years, that it

24   was initially a shorter sentence and then something

25   happened, and they sort of --

1        I'm sorry.  I guess the short answer is, I don't

2    know, but I think there was something a bit unique about

3    that sentencing.

4        THE COURT:  In any case it's clear that he didn't

5    do the eight years unless he somehow got much more -- he

6    might have gotten quite a bit of credit for time served

7    actually because it looks like the arrest was in 2009, but

8    even that he would have only done, you know, six years --

9        Okay.  And my other question for you -- if you

10   don't have the information, feel free to let me know.  It

11   looks to me from the bond report like the July 29th, 2019,

12   arrest has two separate counts, one of which is possession

13   of a firearm and the other of which is possession of a BB

14   gun.

15       Are you aware of whether I'm reading that

16   correctly?

17       MS. HUDLESTON:  Your Honor, I am not aware of

18   whether -- it sounds like you're reading it correctly based

19   on what I'm looking at, too, but unfortunately I don't have

20   those charging documents, so I'm not able to give us any

21   further enlightenment as to whether it was a BB gun or what

22   the two charges mean.

23       THE COURT:  Okay.  Thank you.  Thank you for your

24   comments, Ms. Hudleston.

25       Mr. Bruder, do you need a minute to speak to your

1    client about anything before you get to do your reply?

2            MR. BRUDER:  I don't think so, Your Honor, but if

3    Mr. Smith would like to speak with me before my reply, I

4    would certainly be willing to go to a breakout room and do

5    so.

6            THE COURT:  Mr. Smith, I will leave it up to you.

7    Do you need a minute with Mr. Bruder before his reply, or

8    are you okay to proceed?

9            THE DEFENDANT:  No.  Proceed.

10           THE COURT:  If we were together in a courtroom,

11   you could lean over and pick his brain, but we can't do

12   that here.

13           Mr. Bruder?

14           MR. BRUDER:  Thank you, Your Honor.  I'm going to

15   limit my comments to the presentation recently made by the

16   U. S. Attorney.

17           With respect to the gas station and the notion

18   that there was a drug transaction observed by police, I

19   note, first of all, that Mr. Smith has repeatedly in a

20   number of occasions vehemently denied participating in any

21   drug transaction at the station.

22           He wasn't admittedly, he didn't admittedly make

23   that statement to police officers because they considered

24   the evidence to be so inconsequential they never asked him

25   any questions about it at the time of his arrest, and the

1   purported evidence as reflected in the police reports

2   includes, among other things, Mr. Smith having money in his

3   hand which the officer said was a clear indication of a

4   drug transaction.

5          Of course, as Mr. Smith noted, it's also a clear

6   indication of getting change inside the station for buying

7   a soda, which is in fact what he did.  So under the

8   circumstances, I don't think that particular allegation

9   should carry any substantial weight with respect to bail

10  issues.

11         With respect to Ms. Hudleston's presentation, she

12  noted some significant information about the factual

13  circumstances of the second degree assault conviction, and

14  I understand why she did so because frankly they're pretty

15  compelling.  They also took place about five or six years

16  ago and do not reflect Mr. Smith's recent behavior.

17         I can't, and I want to make it clear.  I'm not

18  trying to minimize the circumstances of that offense.  It

19  is something that Mr. Smith has to deal with, but it

20  certainly is not reflective of his recent behavior.

21         As far as the aliases are concerned, the first

22  time I heard about those aliases was in the bond report

23  that was issued just a few hours ago.  Prior to that, I had

24  no indication that there was any claim that Mr. Smith was

25  using any aliases.  It's not reflected in the indictment.

1    It's not reflected even in the police reports that I've

2    seen about Mr. Smith.

3              So I don't know where that information came from,

4    and I'm not in a position to comment on it directly, as

5    well as the pending, what I'm going to refer to as the BB

6    gun incident.  I looked at the bond report again.  It

7    doesn't contain any more information than the Court already

8    saw, and I am simply relying on my conversation with

9    Mr. Smith in which he insists the offense involved a BB

10   gun.

11             So without looking at the charging documents, I'm

12   afraid I can't offer the Court an explanation.  I know

13   Ms. Vang is here.  Maybe she has more information than I

14   do, but I think that one aspect of Ms. Hudleston's comments

15   that I do think warrants some consideration by the Court is

16   the recent information from Mr. Smith's sister as to his,

17   you know, mental health and drug addiction issues.

18             In a sense that's a two-edged sword.

19   Ms. Hudleston says that suggests he's a danger to the

20   community and we shouldn't release him, particularly if you

21   combine it with his other history in the year preceding

22   this incident.

23             By the same token, it also indicates that the

24   defendant's -- that much of the information that

25   Ms. Hudleston is using to suggest that the defendant is a

1    threat to the community is in fact more closely tied to a

2    chemical addiction problem, which could be addressed by the

3    Court if it were to release Mr. Smith to either a halfway

4    house or to place him in a CD program when a bed opens

5    itself up to him.

6            And in either of those instances, Mr. Smith noted

7    he would certainly be in a better position from a health

8    standpoint than at the Sherburne County jail where he does

9    remain concerned about the spread of COVID through the

10   facility.

11           So from that perspective, Your Honor, I think it

12   offers the Court an alternative that would assure that

13   Mr. Smith doesn't pose a danger to the community and will

14   appear for his court appearances.

15           THE COURT:  All right.  Thank you, Mr. Bruder.

16           Ms. Vang, do you have any additional information

17   regarding the July 29th, 2019, Hennepin County arrest?

18   It's fine if you don't.  If you do, it would be helpful.

19           PROBATION OFFICER VANG:  I do have the MN-Sys

20   screen open.  I can share the screen and the charges, if

21   you would like.

22           THE COURT:  That would be helpful.

23           PROBATION OFFICER VANG:  Can everybody see this?

24   Here are the charges.

25           THE COURT:  So it looks like both of those are

 1    charged as gross misdemeanors.  Neither appears to be

 2    charged as a felony.  The bond report describes it as a

 3    felony.

 4            Any thoughts about that?

 5            PROBATION OFFICER VANG:  I apologize, Your Honor.

 6    That could be my error on my end.  I will update it.

 7            THE COURT:  And we don't have anything beyond

 8    this?

 9            PROBATION OFFICER VANG:  We don't.

10            THE COURT:  Okay.  Thank you.  All right.  I have

11    very, very carefully reviewed the record in this case.  I

12    am going to order that Mr. Smith remain in custody, and I

13    know that that's an incredible disappointment to him.  I'm

14    going to explain my reasoning.

15            It boils down to the fact that the record before

16    me demonstrates there are no conditions or combination of

17    conditions that can assure the two prongs set forth in the

18    statute, the safety of the community and attendance to the

19    court.

20            I'm going to put aside the two car-jackings,

21    which are very serious but somewhat dated, and we don't

22    have a lot of additional information about them.  It

23    appears to me that Mr. Smith was out of custody for less

24    than a year, but even assuming it was a little longer, when

25    the most serious conduct, the shooting in 2016, took place.

1          It is true that that happened four years ago.  It

2     appears that Mr. Smith has been out of custody for roughly

3     three years, maybe a little less.  My biggest concern, that

4     there is a relentless pattern of violations in the 2019

5     year, calendar year January to December, that have nonstop,

6     noncompliance issues.

7          There are three I count but perhaps four separate

8     efforts to place Mr. Smith at either a treatment facility

9     or a sober house, something with more structure that also

10    addresses the treatment needs that Mr. Bruder has correctly

11    identified.

12         In each case, Mr. Smith is, seems to have left

13    that placement very quickly, usually resulting in the

14    issuance of a warrant, sometimes resulting in him being

15    arrested in a different town.  He was then after those

16    countless efforts in three placements held in custody from

17    December to June, and he was out roughly one month and a

18    week in the year of 2020 when he was arrested on two or

19    three -- on three separate occasions.

20         The first was for felony possession of stolen

21    property, and within a week he was arrested again with what

22    appears to be a BB gun, and then not long after that was

23    arrested again on the federal offense.

24         I take Mr. Bruder at his word.  There may be very

25    interesting Fourth Amendment, important Fourth Amendment

1    questions here, but those are for another magistrate judge

2    to sort out.  I know the delay in the hearing has been

3    frustrating, but it does not change the calculus that I

4    need to apply.

5           I also note that Mr. Bruder is correct that the

6    question of armed career criminal is always complicated.  I

7    hope it gets answered for Mr. Smith well before sentencing

8    so he can make educated decisions about this case, but I do

9    note that with at least a cursory review that he is a real

10   risk at facing an armed career criminal even if that is not

11   certain at this time.  That creates a very strong incentive

12   to flee.

13          Finally, I'm going to express that I have a great

14   concern about the relationship of Mr. Smith's criminal

15   history in firearms, which is part of what adds to my

16   concern for the safety of the community.  This isn't just a

17   situation of repeated noncompliance with the law.

18          It's repeated noncompliance with the law

19   involving firearms for someone who four years ago was

20   convicted of a pretty violent shooting, and so those facts

21   combined lead me to conclude that there are no combination

22   of conditions that can ensure the safety of the community.

23          I do note that I don't doubt that Mr. Smith cares

24   very much about his family and wants to be there for them,

25   that he is frustrated by being held in custody, that he has

1    concerns for his children and that his family has concerns

2    about him.  Those are all true, but those don't change my

3    decision in this matter.

4            Ms. Hudleston, can you prepare a draft order for

5    my review and alteration?

6            MS. HUDLESTON:  Certainly, Your Honor.

7            THE COURT:  Okay.  Thank you.  Anything else on

8    behalf of the United States, Ms. Hudleston?

9            MS. HUDLESTON:  No, Your Honor.

10           THE COURT:  Mr. Bruder, anything else on behalf

11   of Mr. Smith?

12           MR. BRUDER:  No, Your Honor.

13           THE COURT:  Would you like the opportunity to

14   visit with Mr. Smith in the breakout room?

15           MR. BRUDER:  Probably for a few minutes.  That

16   would be helpful, Your Honor.

17           THE COURT:  Okay.  Take care of yourself,

18   Mr. Smith.  I'm going to arrange for you to visit with your

19   client -- or your attorney, and we are in recess.  Thank

20   you all.

21                   *        *         *

22           I, Kristine Mousseau, certify that the foregoing

23   is a correct transcript from the record of proceedings in

24   the above-entitled matter.

25   Certified by:  s/  *Kristine Mousseau, CRR-RPR*
                            Kristine Mousseau, CRR-RPR