<pre>
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                    )
      United States of America,       )   File No. 20-cr-207
 4                                    )           (JRT/HB)
              Plaintiff,              )
 5                                    )
      v.                              )   St. Paul, Minnesota
 6                                    )   May 18, 2021
      Romelle Darryl Smith,           )   1:30 p.m.
 7                                    )
              Defendant.              )
 8    ------------------------------------------------------------

 9               BEFORE THE HONORABLE HILDY BOWBEER
             UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
10                      (MOTIONS HEARING)

11    APPEARANCES
       For the Plaintiff:         U.S. ATTORNEY'S OFFICE
12                                SARAH HUDLESTON, AUSA
                                  300 S. 4th St., #600
13                                Minneapolis, Minnesota 55415

14     For the Defendant:         GLENN BRUDER, ESQ.
                                  9531 W. 78th St., #210
15                                Eden Prairie, Minnesota 55344

16     Court Reporter:            DEBRA K. BEAUVAIS, RPR-CRR
                                  300 S. 4th St., #1005
17                                Minneapolis, Minnesota 55415

18

19

20

21        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
22

23

24

25
</pre>

**I N D E X**

PAGE

<u>JASON SCHMITT</u>

    Direct Examination by Ms. Hudleston     7

    Cross-Examination by Mr. Bruder     34

    Redirect Examination by Ms. Hudleston     61

    Recross-Examination by Mr. Bruder     64

<u>ADAM LEPINSKI</u>

    Direct Examination by Ms. Hudleston     66

    Cross-Examination by Mr. Bruder     74

    Redirect Examination by Ms. Hudleston     82

<u>ANDREW SCHROEDER</u>

    Direct Examination by Ms. Hudleston     86

    Cross-Examination by Mr. Bruder     94

    Redirect Examination by Ms. Hudleston     98


**GOVERNMENT EXHIBITS**

| Exhibit | Page |
|---------|------|
| 1 | 6 |
| 2 | 6 |
| 3-A | 6 |
| 3-B | 6 |
| 4 | 6 |
| 5 | 6 |
| 6 | 6 |
| 7 | 6 |
| 8 | 6 |
| 9 | 6 |
| 10 | 6 |
| 11 | 6 |
| 12 | 6 |
| 13 | 85 |

1              **P R O C E E D I N G S**

2                  **IN OPEN COURT**

3              THE LAW CLERK:  All rise.  United States District

4     Court for the District of Minnesota is now in session, the

5     Honorable Hildy Bowbeer presiding.

6              THE COURT:  Good afternoon, everyone.  Please be

7     seated.

8              I'm Magistrate Judge Hildy Bowbeer, and we are in

9     court this afternoon for a hearing on certain motions in the

10    matter of United States of America v. Romelle Smith.  This

11    is Matter No. 20-cr-207.

12             Let me start by getting appearances, first on

13    behalf of the United States.

14             MS. HUDLESTON:  Good afternoon, Your Honor.  Sarah

15    Hudleston for the United States.  And with me at counsel

16    table is Cory Shelton of the ATF.

17             THE COURT:  Good afternoon.

18             And on behalf of Mr. Smith.

19             MR. BRUDER:  Good afternoon, Your Honor.  My name

20    is Glenn Bruder -- the last name is spelled B-R-U-D-E-R --

21    appearing on behalf of the defendant, who is seated beside

22    me.

23             THE COURT:  And good afternoon to both of you.

24             As I indicated, this is a hearing on certain

25    dispositive motions that were filed by defendant.  I have

1     Docket No. 28, which is defendant's motion to suppress

2     statements, admissions, and answers; and I have Docket No.

3     30, which is defendant's motion to suppress evidence

4     obtained as a result of search and seizure.

5            First, Mr. Bruder, are there any other motions

6     that I overlooked that you had anticipated would be

7     addressed this afternoon?

8            MR. BRUDER:  No, Your Honor.  Those are the two

9     motions I anticipated would be heard today.

10           THE COURT:  All right.  And, Ms. Hudleston, am I

11    missing anything from the government's perspective?

12           MS. HUDLESTON:  Just, Your Honor, that the

13    pre-hearing filings, the defendant had withdrawn Motion 28

14    and we were here today solely on Motion 30, according to our

15    prior communications and also what we conveyed, I believe,

16    in the statements for the Court.

17           THE COURT:  And I wanted to double-check on that.

18    I knew that your responsive motion, Ms. Hudleston, indicated

19    that you expected the defendant would be withdrawing the

20    motion.  I couldn't remember if you had actually seen that

21    reflected on the docket or not.

22           But, Mr. Bruder, this is a perfectly good place to

23    clarify that.  Are you still maintaining the motion to

24    suppress statements at Docket No. 28?

25           MR. BRUDER:  Your Honor, I think that we had

1    clarified it.  I believe that's encompassed in motions to

2    suppress evidence obtained as a result of the search and

3    seizure.  If there hadn't been a stop of the vehicle, there

4    wouldn't have been a statement.  So I think that they're

5    encompassed in the same thing.  I don't think there needs to

6    be any separate testimony about the statement.

7              THE COURT:  Got it.  So, in other words, if I

8    conclude that the vehicle stop was inappropriate, then your

9    position would be that the statements that followed the stop

10   should also be excluded.  But you are not maintaining a

11   separate basis for suppressing those statements, such as,

12   for example, a failure to give a Miranda warning or

13   something like that?

14             MR. BRUDER:  That is exactly correct, Your Honor.

15   If the stop was reasonable, the statement is coming in.

16             THE COURT:  All right.  Thank you for clarifying

17   that.  I appreciate it.  Very well.

18             Then I understand that we have some exhibits that

19   were provided to the Court in advance.  Have counsel met and

20   conferred with regard to those exhibits, Ms. Hudleston?

21             MS. HUDLESTON:  Yes, Your Honor, we have.

22             THE COURT:  And do you want to go ahead and offer

23   them, and then I'll check for the record to see whether

24   Mr. Bruder has any objections?

25             MS. HUDLESTON:  Yes, Your Honor.  At this time I'd

1      like to offer for admission for today's hearing Government

2      Exhibits 1 through 12, and that includes both a 3-A and a

3      3-B.

4              THE COURT:  And, Mr. Bruder, do you have any

5      objection to those exhibits for purposes of this hearing?

6              MR. BRUDER:  Ms. Hudleston has provided me with

7      copies of those documents, Your Honor, and I have no

8      objection to any of them.

9              THE COURT:  All right.  Then Exhibits 1 through

10     12, including both 3-A and 3-B, will be admitted.

11              And, for the sake of the record, I will treat the

12     copies of the exhibits that had been provided electronically

13     to the Court as the official exhibits for purposes of this

14     hearing.

15              Mr. Bruder, before I let Ms. Hudleston move on

16     with witnesses, is there anything you wanted to provide by

17     way of overview before we hear the testimony in this matter?

18              MR. BRUDER:  I don't believe so, Your Honor.  I

19     think the Court has an idea of what the issue is and the

20     testimony will develop that.

21              THE COURT:  All right.  Then, Ms. Hudleston, are

22     you ready to call your first witness?

23              MS. HUDLESTON:  I am, Your Honor.  I will just

24     note for the Court that I will be using the podium because

25     all of the exhibits are electronic.

```
 1              THE COURT:  Understood.  I would prefer if you are
 2     going to be using the podium at all, go ahead and stay up
 3     there the entire time, rather than having to run back and
 4     forth to your seat.
 5              MS. HUDLESTON:  Okay.  Great.  Thank you.
 6              THE COURT:  Very well.
 7              MS. HUDLESTON:  At this time the government calls
 8     Officer Jason Schmitt.
 9              THE COURT:  Okay.  Officer Schmitt.  Please raise
10     your right hand.
11                          (Witness sworn.)
12              THE COURT:  All right.  Please be seated.
13              And please state your full name and spell your
14     last name.
15              THE WITNESS:  Jason Schmitt, S-C-H-M-I-T-T.
16              THE COURT:  Please go ahead, Ms. Hudleston.
17              MS. HUDLESTON:  Thank you, Your Honor.
18
19     JASON SCHMITT
20                          DIRECT EXAMINATION
21     BY MS. HUDLESTON:
22     Q.  Good afternoon, Officer Schmitt.
23     A.  Good afternoon.
24     Q.  What do you do for a living?
25     A.  I'm employed by the City of Minneapolis Police
```

```
1    Department as a police officer.
2    Q.  How long have you been a police officer for the
3    Minneapolis Police Department?
4    A.  Approximately 23 years.
5    Q.  And what are your primary duties?
6    A.  I am assigned as an officer with the Minneapolis Police
7    Department, so any duties that would fit an officer.  For
8    purposes of this case, I was assigned most recently to the
9    Gun Investigations Unit as a weapons and violent crimes
10   investigator.
11   Q.  And were you working as a weapons and violent crimes
12   investigator last year, July 2020?
13   A.  Yes, I was.
14   Q.  I'm going to refer you back to July 16th, 2020.  What
15   happened in Powderhorn Park in Minneapolis that day?
16   A.  In Powderhorn Park there was a shooting incident in
17   which an individual was shot in the head.
18   Q.  And were you part of the team working on that case?
19   A.  Yes.
20   Q.  What information did you get about the suspect in the
21   shooting?
22   A.  Preliminarily I learned some information about a suspect
23   with a street name of Bam and was asked if I -- throughout
24   our team communications if I knew of an individual that used
25   that street name.
```

1          We had a couple other officers that knew some

2     individuals by the name of Bam.  As we gathered additional

3     information, we learned that the Bam that we were looking

4     for was the individual that I knew as Jamichael Ramey.

5     Q.  So you knew Jamichael Ramey used the street name Bam.

6     Had you met Jamichael Ramey before?

7     A.  I had not.

8     Q.  And once you had the suspect's identity, what did you do

9     to try to find him?

10    A.  With the identity of the suspect known and his general

11    area of operations being on the south side of Minneapolis,

12    which was my belief, I reached out into a CRI network and

13    asked a particular CRI if they knew of a phone number or a

14    way that Bam/Jamichael Ramey could be contacted so that I

15    could find a way to try to track that person.

16    Q.  Okay.  And just to be clear, can you, please, tell the

17    Court what a "CRI network" is.

18    A.  Yes.  I'm sorry.  Confidential reliable informant.

19    Q.  And so you asked a particular confidential reliable

20    informant for contact information for Bam; is that right?

21    A.  I did.

22    Q.  Did you get a phone number?

23    A.  I did.

24    Q.  And what did you learn about that phone number?

25    A.  The CRI provided the telephone number and then shortly

1    thereafter stated that they had recently -- and by

2    "recently" I mean like within that time frame of me

3    contacting the CRI and the time they got back to me --

4    spoken to Bam on that phone.

5    Q.  And how close in time was the CRI talking to Bam on that

6    number to the shooting?

7    A.  This would've been within about five to six hours.

8    Q.  Okay.  And just to be clear, when I say "Bam" and

9    "Jamichael Ramey," I'm going to use those interchangeably.

10   Okay?

11   A.  Okay.

12   Q.  And is that how you understood it at the time, that you

13   would use "Bam" sometimes to refer to Jamichael Ramey?

14   A.  Now that the street name of Bam has been established as

15   Jamichael Ramey, we can refer to him as his given name.

16   Q.  Okay.  So once you had that phone number for Jamichael

17   Ramey, did you do something to try to track that down?

18   A.  Yes.  I used the investigative tool of a cell phone GPS

19   tracking order.  So I wrote a court order to track the

20   particular cell phone number and submitted that to the

21   Hennepin County signing judge for review and signature.

22   Q.  And did you get a judge's signature on that?

23   A.  I did.

24   Q.  And is that also called a GPS location warrant?

25   A.  Yes.

1    Q.  Or sometimes is it also referred to as a ping warrant or

2    a ping order?

3    A.  Yes.

4    Q.  And could you, please, explain in general how a tracking

5    order works.

6    A.  So once the signed copy of the tracking warrant is in

7    hand that would be generally emailed to the carrier.  In

8    this case, I believe it was T-Mobile.

9            Once T-Mobile would have the court order in hand

10   they use the language in there and activate the technology

11   that allows them to send out an email to my email every 15

12   minutes that will show the location of where that handset is

13   within a given radius.

14   Q.  Okay.  And so you were receiving these 15-minute email

15   updates from the carrier; is that right?

16   A.  Yes.

17   Q.  And did you get this GPS warrant on or about the day of

18   the shooting, July 16th, 2020?

19   A.  I did.

20   Q.  With your information in hand did you create an

21   operations plan for arresting Jamichael Ramey?

22   A.  Yes.

23   Q.  And in this case did you, in fact, create an original

24   and an updated plan?

25   A.  Yes.

1    Q.  What, in general, is an operations plan?

2    A.  The operations plan is a working Word document that we

3    used within the Gun Investigation Unit in order to

4    distribute information about the case that we're working on

5    to all the different officers or agents that are involved or

6    are going to be involved with the case.

7            It would list pertinent information such as

8    locations, radio channels that are used, who the case agent

9    is, phone numbers so everybody had contact with each other.

10   It would list mostly -- in this case especially it would

11   have a picture.  It would have a name for Jamichael Ramey on

12   it and a small synopsis of what the case is and what we

13   would like to accomplish with the case in general.

14   Q.  And here what were you trying to accomplish?

15   A.  In this case, we were trying to arrest Jamichael Ramey

16   for the assault related to the shooting.

17   Q.  And when you say "assault" is that because the victim

18   who was shot in the head was injured and in the hospital but

19   had not died?

20   A.  Correct.

21   Q.  You said you included a photo.  I'm going to pull up

22   what's admitted into evidence as Government Exhibit 2.  It

23   should appear on your screen.  I'm sorry for kind of the

24   warped presentation, but that's the nature of the

25   orientation of these monitors.

1              Do you recognize this?

2    A.  I do.

3    Q.  And what is it?

4    A.  It's the target information page from the operations

5    plan.

6    Q.  And there's a name on there, Jamichael Nathaniel Ramey.

7    Is this who you were looking for that day?

8    A.  It is.

9    Q.  And where did you get these two photos that are on

10   there?

11   A.  The first photo is a Hennepin County booking photo from

12   the Henn RAP system.  And I believe the second photo is -- I

13   don't recall exactly where I got it, but most likely it

14   would've been from a Facebook -- probably a clip from a

15   Facebook or something similar.

16   Q.  Facebook or a social media posting?

17   A.  Yes.

18   Q.  And did you send out the updated operations plan on or

19   about July 20th, 2020?

20   A.  I did.

21   Q.  And why did you send out a second plan that day?

22   A.  We utilized the first plan on or about the 16th and 17th

23   when we were initially early in the investigation phase.

24   Unfortunately, to the best of my recollection, I don't think

25   we had good location data coming in yet.  I don't think

1    T-Mobile got the phone number up and running with the GPS

2    location in time for the weekend.  So I updated the

3    operations plan for Monday so everybody (1) knew a little

4    bit more about where we were going to be working the case

5    that day and (2) that everybody had a fresh copy readily

6    accessible on their mobile devices.

7    Q.  And just to be clear, the updated plan, did that note

8    that you had -- by the time you reached the 20th you had

9    already had location data putting that GPS ping at a

10   particular address for Monday?

11   A.  Yes.  The GPS data had been rolling in throughout the

12   weekend, and I had been monitoring that and trying to

13   establish a known pattern.

14   Q.  And did you see a known pattern?

15   A.  I did.

16   Q.  What did you see?

17   A.  I noted that the GPS was returning and staying near the

18   address of XXXXXXXXXXXXXXXXXXXXX in the City of

19   Minneapolis.

20   Q.  Okay.  And I'll come back to the XXXXXXXXXXXX in a

21   moment.

22           I just want to refer you to Government Exhibit 2.

23   So this shows us some information about Jamichael Ramey;

24   approximate height and weight, his hair.  It looks like that

25   was maybe based on the left-hand photograph.  Is that right?

1    A.   Yes.

2    Q.   And then his date of birth shows January 1992, so he

3    would have been 29 last summer, is that right, I think, if

4    my math is right?

5    A.   That sounds right.

6    Q.   Or close to 29.

7         You do note the hairstyle there.  Do you put a lot

8    of stock into the description of a target's hair in these

9    information profiles?

10   A.   No.

11   Q.   And why not?

12   A.   Hair and some other features can be easily modified.

13   Q.   I'm going to get this off the screen.

14        In your operations plan did you include anything

15   about Ramey's criminal history?

16   A.   I did.

17   Q.   And what did you include about that?

18   A.   I believe I listed two items in there that were more

19   noted towards the violent end of the spectrum.  I think he

20   had a conviction for ag assault -- or, sorry, aggravated

21   robbery.  There was -- after searching through the

22   Minneapolis PIM system, there appeared to be a pending case

23   for a gun possession.

24   Q.   And is the PIM system an internal record system so you

25   could see criminal activity of someone?

```
1    A.  The PIM system is the Minneapolis report writing

2    database.

3    Q.  Okay.  And why do you include in your operations plan

4    some information about a target's criminal history?

5    A.  The criminal history, along with the known offense that

6    we're tracking them for, is something that's requested of us

7    from our supervision.  They want to know what kind of

8    criminal history we're looking at and trying to, I guess,

9    denote what level of violence we may be dealing with from an

10    individual.

11    Q.  And is that to help plan for officer and community

12    safety?

13    A.  Yes.

14    Q.  Did you know of a possible motive for the shooting in

15    Powderhorn Park?

16    A.  To the best of my recollection, I believe that there was

17    some type of a drug argument or something similar.

18    Q.  And did you also note that on the operations plan, that

19    it may have been about a drug dispute, a narcotics beef?

20    A.  I don't recall.

21    Q.  Now, you mentioned that in the updated operations plan

22    you noted that you had been getting consistent GPS

23    information back to a particular address; is that right?

24    A.  That's correct.

25    Q.  And that was the XXXXXXXXXXXXXXXXXXXXXX in Minneapolis
```

1    that you mentioned?

2    A.  Yes.

3    Q.  Okay.  What's at that address?

4    A.  That particular address is a -- I think it's a -- it's a

5    multi-story apartment complex.

6    Q.  And I'm just going to pull up here Government Exhibit 10

7    and ask you if you recognize that?

8    A.  I do.

9    Q.  And what is it?

10   A.  That is the front of the building, XXXXXXXXXXXXXXXXX

11   XXXXX.

12   Q.  Okay.  And this is taken from Google street view, so not

13   your exact time and date you were there, but it's just to

14   show the building.  Is that right?

15   A.  Yes.

16   Q.  Now, did you know on July 20th, 2020 where Jamichael

17   Ramey lived?

18   A.  No.

19   Q.  Did you know whether he had a job?

20   A.  I did not.

21   Q.  Once you got GPS data that was consistently showing up

22   at XXXXXXXXXXXXXXXXXXXXXXX, what did you do?

23   A.  With that information in hand myself and other officers

24   on the 20th I re-sent out a brief sheet and we moved to that

25   area to establish surveillance.

1    Q.  And did you, yourself, go over to that building?

2    A.  I did.

3    Q.  When did you go?

4    A.  It was in the morning time.  Probably somewhere in the 9

5    o'clock region.

6    Q.  Okay.  And that was July 20th, 2020, right?

7    A.  Yes.

8    Q.  And who was on the surveillance team that day or to the

9    best of your memory?

10   A.  We had multiple officers that were out assisting us.  We

11   had Sergeant Adam Lepinski, Sergeant Andrew Schroeder,

12   Officer Jeff Werner, Officer Jesse Standal, Sergeant Luke

13   Peterson.  Officer Richard Walker I think was out there.

14   Officer Chris Dauble.

15   Q.  And who had direct surveillance of the apartment

16   building at XXXX?

17   A.  Initially, I set up with the direct surveillance or what

18   we consider and call the "eye."

19   Q.  So were the others then farther away and did not have

20   direct surveillance of that building?

21   A.  Correct.

22   Q.  And were you alone that morning?

23   A.  Yes.

24   Q.  What kind of vehicle were you in?

25   A.  It's a Chrysler minivan.

1    Q.  And where were you situated in the minivan while you

2    were doing the surveillance?

3    A.  I was parked on 33rd Avenue North north of that

4    particular address on the west side of 33rd Avenue North

5    facing southbound.  And I would estimate it's approximately

6    100, 125 yards north of the address.

7    Q.  Okay.  And can you, please, describe the general scene

8    in that area.

9    A.  Well, the general neighborhood, I guess -- it's a street

10   that has multiple apartment complexes on it.  It's a busy

11   area for foot traffic.  There is a small market that is

12   directly in back of XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX that

13   gets heavy foot traffic.

14   Q.  And so why were you not right up front in front of the

15   apartment building?

16   A.  As part of our methods of surveillance, we attempt to

17   stay far away from a building if we can.  While we're often

18   very successful with what we do with surveillance, parking

19   too close to a building will -- can flag somebody to see

20   that there's a car that doesn't belong in their neighborhood

21   or that doesn't belong to the apartment building parked

22   right in front.

23          And we were looking to and we do look to try to

24   maintain as low a visibility as we can so that we can

25   actually see the criminal behavior or whatever type of

1   behavior we're looking to surveil.

2   Q.  I'm going to now show you Government Exhibit 11.  You

3   can see there it's another Google street photo.

4           Do you recognize what's shown here?

5   A.  Yes, I do.

6   Q.  And what's depicted in Government Exhibit 11?

7   A.  This is a street view of 33rd Avenue North looking to

8   the south.  It appears that -- this is just to the south of

9   where the curve for 33rd and Sander Drive link up because

10  33rd and Sander Drive are kind of a horseshoe that come back

11  out to 58th.

12  Q.  And down at the end here -- I'll try to blow that up --

13  what's down on this end of the block there (indicating)?

14  A.  That is where the target building of XXXXXXXXXXXXXXXX is

15  located.

16  Q.  Okay.  So on Government Exhibit 11 it's kind of all the

17  way to the back on the left; is that right?  Or the end of

18  the street on the left I should say.

19  A.  I mean, it's hard to tell there.  I would suppose it's

20  kind of close toward the north far end.

21  Q.  Okay.  If we go back to Government Exhibit 10, you can

22  see it's the corner building, is that right, on XXXXXXXXXXXX

23  XXXXX?

24  A.  Yep.  That's correct.

25  Q.  Okay.  And can you describe, using Government Exhibit

```
 1    11, approximately where you were positioned looking down

 2    toward XXXX.

 3              MS. HUDLESTON:  I'm sorry, are these screens

 4    circleable?

 5              THE COURT:  Yes.

 6    BY MS. HUDLESTON:

 7    Q.  Could you mark on your screen approximately where you

 8    were.

 9    A.  It's tough to say for sure because I would've taken

10    whatever kind of parking spot I could have gotten, but I

11    know I was towards the farther north end.

12              They are not markable.

13              I guess when you're looking at your screen --

14              THE COURT:  They may not be at the moment.  I

15    think you may be able to circle, but I'm not -- it's been a

16    while since we've used the screens.

17              MS. HUDLESTON:  That's okay.

18    BY MS. HUDLESTON:

19    Q.  You said you were approximately 125 yards north.  So

20    you'd be looking down at the apartment building from this

21    end of the street (indicating) but about 125 yards from the

22    apartment; is that right?

23    A.  So -- in general, yes, those numbers are correct.  You

24    know, it's an estimate.  I would think that the car that

25    your cursor is on kind of right now, it looks like a silver
```

1     possible Malibu or something like that, somewhere in that

2     region, but parked along the curb on that side of the

3     street.

4     Q.   Okay.  So somewhere along this area here (indicating).

5              And you said wherever you could find a spot.  Did

6     there tend to be a fair number of cars on that street?

7     A.   Yes.

8     Q.   On the 20th of July last summer, did you have a clear

9     line of sight from your surveillance position to the front

10    door of XXXX?

11    A.   I guess I had what I would consider adequate line of

12    sight given, you know, trees, cars, light poles, whatever is

13    generally out on the street at that time.

14    Q.   And did you have binoculars?

15    A.   Yes.

16    Q.   So as you're sitting there on July 20th, 2020 in the

17    morning, what did you see?

18    A.   Throughout the morning while on surveillance there was

19    foot traffic coming and going.  There was cars coming and

20    going from the area.

21              You know, I think we -- we noted -- I believe I

22    noted the vehicles that were parked in front of the address

23    believing that most likely vehicles that would be parked in

24    front of the address would most likely be associated with

25    the address.

1    Q.  And did you note a particular vehicle that was parked in

2    front of XXXX?

3    A.  I recall a vehicle that my attention was drawn to --

4    that our attention was drawn to later as a red GMC Envoy.

5    Q.  And where was it parked in relation to the apartment

6    building?

7    A.  For the most part, directly in front of the building

8    facing northbound on 33rd Avenue.

9    Q.  Did you see someone that morning you thought might be

10   Jamichael Ramey?

11   A.  I did.

12   Q.  And what did he look like?

13   A.  I saw a black male in generally what I considered a same

14   age range.  I noted the individual moving in and about the

15   area from the apartment building.  And there was a -- the

16   individual was wearing a black Adidas jacket that had the --

17   kind of the three -- I believe the three, like, white

18   stripes down the sleeve, which kind of is consistent with

19   Adidas materials.

20   Q.  And when you said "in and about the area" and then you

21   said "from the apartment building," is this someone you saw

22   going in and out of XXXX?

23   A.  Yes.

24   Q.  Did you notice any tattoos on his face from where you

25   were positioned?

1    A.  No.

2    Q.  Did you eventually leave your direct eyes on the

3    building?

4    A.  Yes.

5    Q.  And at some point did someone take over for you?

6    A.  Yes.  Sergeant Adam Lepinski took the main surveillance

7    eye and I drove off the block.

8    Q.  Okay.  Did you hear Sergeant Lepinski radio about a man

9    who was possibly Ramey leaving the apartment building at

10   XXXX?

11   A.  I did.

12   Q.  And during this time what was happening with the GPS

13   email updates that you were receiving?

14   A.  So, again, the GPS sends an email every 15 minutes.  And

15   Sergeant Lepinski had called out over the radio that a male

16   that he -- a male -- I'm sorry, I'm going to slow down a

17   little bit here.

18          He aired out on the radio that he had a GMC Envoy

19   that we had noted in front of the address was leaving the

20   area and that the black male that we had discussed over the

21   radio wearing the black Adidas jacket was in that vehicle

22   and leaving.

23          Just during that period of time we had lost the

24   last two GPS location cycles.

25   Q.  And when you say "lost," what do you mean by that?

1    A.  We did not get any data sent from the carrier.  So it

2    came up as unknown locations.

3    Q.  And why would that happen?

4    A.  It can happen for a variety of reasons.  One reason --

5              MR. BRUDER:  Objection, lack of foundation as to

6    the witness's ability to know.

7              MS. HUDLESTON:  May I rephrase?

8              THE COURT:  You may.

9              Mr. Bruder, just so our court reporter can hear

10   you would you speak up and provide that objection again.

11   You can stay seated so you're next to the microphone.  It's

12   just that your voice was a little muffled.

13             MR. BRUDER:  The objection was lack of foundation

14   as to the witness's knowledge.

15             THE COURT:  All right.

16             Ms. Hudleston, you offered to rephrase the

17   question.

18             MS. HUDLESTON:  Yes.

19   BY MS. HUDLESTON:

20   Q.  Have you had experience with other GPS tracking in other

21   cases?

22   A.  Yes, I have.

23   Q.  In your training and experience, what does that mean

24   when you get an email with no location information?

25   A.  It can mean a variety of things.  For whatever reason

1   the signal was not able to connect with the phone.  That can

2   be for a device that's powered off or for being in a

3   location where the GPS signal sent from the company is

4   unable to access the phone.

5   Q.  And you said you lost two email cycles, so between 30

6   and 45 minutes, is that right, where you didn't get location

7   information?

8   A.  So we would have had 45 minutes without -- I'm sorry, we

9   would have had 45 minutes between GPS cycles.

10  Q.  Okay.  And before you lost the information or before you

11  lost the GPS cycles, were the pings that morning coming back

12  to XXXX?

13  A.  Yes.  They were in and around that area.

14  Q.  And then you mentioned that the radio aired that the GMC

15  Envoy was leaving with the potential suspect inside.  What

16  happened with the pings at that time?

17  A.  At the time that the vehicle left, we were in the middle

18  of a ping cycle, so we were waiting to get the next ping.

19  Q.  And what happened with the next ping?

20  A.  The next ping came in shortly thereafter and placed it

21  at 60th and Portland Avenue South.

22  Q.  And what's located at that area?

23  A.  There's a gas station in particular and some other

24  businesses located there.

25  Q.  And how did that GPS ping compare to what was going on

1    with the Envoy?

2    A.  When the Envoy left, we scrambled our surveillance

3    vehicles to follow.  The 60th and Portland GPS ping came in

4    and I recall that Sergeant Luke Peterson placed information

5    over the air that he had the GMC Envoy at the 60th and

6    Portland gas station.

7    Q.  And so what did you do in response to this information?

8    A.  With that information known it validated our belief that

9    the phone left in that vehicle, and we started to move our

10   resources towards that vehicle in order to enact the

11   operations plan of arresting the target of our assault,

12   Jamichael Ramey.

13   Q.  Did you then give instructions for officers to pull the

14   vehicle over?

15   A.  Yes.

16   Q.  And what happened next?

17   A.  As we were able to get our team in position so that we

18   could safely mitigate the stop and arrest, the vehicle

19   continued to move and ended up moving north on Park and was

20   stopped by officers at 42nd and Park.

21   Q.  And when you gave instructions to pull the GMC over, who

22   did you think was inside that car?

23   A.  Jamichael Ramey.

24   Q.  And why did you think that?

25   A.  We had a person from the street that we had witnessed,

1    both myself and Sergeant Lepinski, that we believed was a

2    possible match to our suspect.

3              Along with that, we had information with the cell

4    phone tracking technology that showed the cell phone and the

5    GMC Envoy moving in tandem together.  We had seen the

6    suspect leave in that vehicle.  And that suspect had been

7    also aired at the scene -- or at the location of the gas

8    station by Sergeant Luke Peterson.

9    Q.  And were you at the stop when it happened, the traffic

10   stop?

11   A.  I was not.

12   Q.  Were you monitoring your police radio?

13   A.  Yes.

14   Q.  And you learned of the stop?

15   A.  Yes.

16   Q.  Did you travel to that area of the stop?

17   A.  Yes.

18   Q.  And on your way there did you get any more GPS pings?

19   A.  I did.

20   Q.  Where to?  Where did they show the location of that

21   phone?

22   A.  The cell phone located to the stop area at 42nd and Park

23   Avenue South.

24   Q.  And I'm going to play for you Government Exhibit 5.

25              (Government Exhibit 5 played.)

1    BY MS. HUDLESTON:

2    Q.   And that shows -- well, first of all, do you recognize

3    the voices on this recording?

4    A.   I do.

5    Q.   And who are they?

6    A.   The clearer voice is Sergeant Luke Peterson.  The one

7    that is being transmitted over the radio is mine.

8    Q.   Okay.  And you tell him you just got that ping in at

9    42nd and Park; is that right?

10   A.   I did.

11   Q.   And so this is 11:58 a.m. on the 20th; is that right?

12   A.   Yes.

13   Q.   Okay.  And as you're monitoring the police radio, when

14   did officers realize that the person in that GMC Envoy was

15   not Jamichael Ramey?

16   A.   I'm sorry, when did the officers?

17   Q.   Yeah.  As you're monitoring the radio, was there some

18   time between the stop and then someone telling you I don't

19   think it's Ramey?

20   A.   Yes, I believe there was.

21   Q.   What, if anything, did you learn about Jamichael Ramey

22   using someone else's phone prior to July 20th, 2020?

23   A.   I learned that in a debriefing.  The driver of the

24   vehicle whose name was Terry Armstrong --

25               MR. BRUDER:  I object to this as hearsay, Your

 1    Honor.

 2              MS. HUDLESTON:  If I may be heard, Your Honor?

 3              THE COURT:  Yes.

 4              MS. HUDLESTON:  Well, for one, the hearsay rules

 5    don't necessarily apply.  But also it's effect on the

 6    listener and not necessarily for -- well, I take that back.

 7    I do want to use it for the truth, but I think it doesn't

 8    apply in this case because of the motions hearing and the

 9    fact that we can't locate Mr. Armstrong anyway to call him

10    as a witness.

11              THE COURT:  Objection overruled.

12    BY MS. HUDLESTON:

13    Q.  Please proceed.  I'll back up.

14              Who was driving the GMC Envoy that day?

15    A.  The GMC Envoy was being driven by a male we identified

16    as Terry Armstrong.

17    Q.  And what did you learn about Terry Armstrong's phone

18    with regard to Jamichael Ramey?

19    A.  We learned that Terry Armstrong was asked what his phone

20    number was and provided the cell phone number to officers

21    that we had been tracking.

22    Q.  And so did you learn anything about whether Jamichael

23    Ramey had used that cell phone in the past?

24    A.  I did.  I learned that Terry Armstrong and Jamichael

25    Ramey were associates.

1    Q.  And did Ramey use Armstrong's cell phone?

2    A.  Yes.  We believe that he did.

3    Q.  And so prior to July 20th, 2020 that cell phone could've

4    been in Ramey's use, but on the 20th it was in Terry

5    Armstrong's possession; is that right?

6            MR. BRUDER:  Object to that as leading.

7            THE COURT:  Overruled.

8            THE WITNESS:  That is correct.

9    BY MS. HUDLESTON:

10   Q.  Why was Mr. Smith arrested that day, Romelle Smith?

11   A.  Mr. Smith was arrested initially because he was believed

12   to be Jamichael Ramey.  And as that arrest was taking place,

13   he was found to be in possession of a handgun on his person.

14   Q.  And did he also have an active warrant?

15   A.  Yes.

16   Q.  Did you take some evidence related to Mr. Smith?

17   A.  I did.

18   Q.  Did you get the gun that was in his possession?

19   A.  I did.

20   Q.  And do you recall, was it loaded?

21   A.  I don't recall.

22   Q.  Okay.  If your report said it was loaded, you would

23   credit that?

24   A.  I would.

25   Q.  Did officers turn over other evidence to you?

1   A.  Yes.

2   Q.  And I'm going to show you now Government Exhibit 8.

3            Do you recognize this?

4   A.  I do.

5   Q.  And what is it?

6   A.  This was narcotics that were recovered from the vehicle

7   that I field tested.  I field tested for methamphetamine,

8   and it tested at the BCA as well for methamphetamine.

9   Q.  And did this, in fact, prove to be methamphetamine?

10  A.  Yes.

11  Q.  And you said that was taken from the GMC Envoy?

12  A.  Yes, it was.

13  Q.  Did police eventually find Jamichael Ramey?

14  A.  Yes, we did.

15  Q.  And has he since pleaded guilty to that shooting crime?

16  A.  Yes, he did.

17  Q.  Showing you Government Exhibit 6, do you see that this

18  is a complaint of State of Minnesota v. Jamichael Nathaniel

19  Ramey?

20  A.  Yes.

21  Q.  And I'm going to just direct you to the third page.  And

22  I'll try to enlarge it a little bit.  I'm sorry, again,

23  about your screen.

24            And in this probable cause statement does it talk

25  about walking up to the victim and shooting him in the head?

1    A.  Yes, it does.

2    Q.  And I'm going to just pull up another paragraph here.

3            Does this paragraph state that the bullet struck

4    the victim near his left temple and traveled through his

5    head area, and that his injuries were life-threatening but

6    he survived?

7    A.  It doesn't say anything about him surviving, but I do

8    know that he did survive.

9    Q.  I think -- does the last sentence say "victim survived"?

10   Maybe your screen is not --

11   A.  I'm sorry, "Victim survived gunshot wound to the head."

12   Q.  So this scenario here is why you were looking for Ramey

13   on July 20th, 2020; is that right?

14   A.  Yes.

15   Q.  And how did the nature of that crime that's described in

16   Government Exhibit 6, how did that impact your approach of

17   trying to arrest Ramey on the 20th of last July?

18   A.  We were taking all precautions going after an individual

19   who had just committed a crime of extreme violence and were

20   using all due caution that we could in order to safely

21   effect his capture.

22           MS. HUDLESTON:  Thank you.  No further questions.

23           THE COURT:  Mr. Bruder, are you going to

24   cross-examine from counsel table or will you be wanting to

25   use the electronics?

```
 1              MR. BRUDER:  At the moment as I sit here, I
 2    anticipate that I'll be able to do it all from my seat at
 3    counsel table.
 4              THE COURT:  Very well.  You may remain seated.  Go
 5    ahead with your cross-examination.
 6              MR. BRUDER:  Thank you, Your Honor.
 7              Is it permissible to remove my mask during
 8    cross-examination?
 9              THE COURT:  I'm fine with that.  Does counsel have
10    any objection?
11              MS. HUDLESTON:  No objection, Your Honor.
12              THE COURT:  Does your client have any objection?
13              THE DEFENDANT:  No, Your Honor.
14              THE COURT:  All right.  Then, yes, you can go
15    ahead, Mr. Bruder.
16              MR. BRUDER:  I would note for the record for
17    whatever it's worth to assure everybody, I have been
18    vaccinated.
19              THE COURT:  All right.  Thank you.
20
21                       CROSS-EXAMINATION
22    BY MR. BRUDER:
23    Q.  Officer Schmitt, I'm going to essentially ask you
24    questions in the order that the U.S. Attorney did, so we'll
25    probably cover the same ground in the same sequence.
```

1           My name is Glenn Bruder, and I represent Romelle

2     Ramey [sic], who is seated next to me.

3           Did you have an opportunity to see Mr. Ramey [sic]

4     after his arrest on July 20th?

5     A.  Mr. Smith.

6     Q.  I'm sorry, Mr. Smith after his arrest on July 20th.

7     A.  Yes.  I did go to the scene of the arrest.

8     Q.  So until he was arrested, you were not looking for

9     Romelle Smith, correct?

10    A.  That's correct.

11    Q.  You had no idea who Romelle Smith was?

12    A.  I did not.

13    Q.  Instead, you've indicated, I think, several times that

14    you were looking for Jamichael Ramey in relation to a

15    shooting, correct?

16    A.  That's correct.

17    Q.  And one of the first things that you did to locate

18    Mr. Ramey was to contact a CRI, which I believe is an

19    acronym that stands for confidential reliable informant,

20    correct?

21    A.  Yes.

22    Q.  Okay.  And you eventually contacted a CRI, correct?

23    A.  Yes.

24    Q.  And since the "C" stands for confidential, I'm assuming

25    you don't want to identify him today.  Correct?

```
1    A.  I do not.

2    Q.  Okay.  Just for the record, I will ask you to identify

3    him today.  Who is he?

4              MS. HUDLESTON:  Objection, Your Honor, informant's

5    privilege.

6              THE COURT:  Objection sustained.

7    BY MR. BRUDER:

8    Q.  The CRI is a real person, correct?

9    A.  Correct.

10   Q.  Okay.  You've met him before?

11   A.  Yes.

12   Q.  Had you met him before July 20th of 2020?

13   A.  I had.

14   Q.  Okay.  And in what context had you met him?

15   A.  In what context?

16   Q.  Did you meet him at a bar over a drink?  Did you meet

17   him because you arrested him?  Did you meet him in the

18   precinct house?  In what context did you meet him?

19   A.  This particular CRI was established as a result of a

20   previous investigation.

21   Q.  Okay.  What type of investigation?

22             MS. HUDLESTON:  Your Honor, at this point I'm

23   going to object.  I think it's okay to have the general

24   information, but the more specific we get, obviously that

25   gets closer to being identifying.
```

1          And separately, also, I think that it's -- there

2    is a lack of relevance because Mr. Smith does not have

3    standing to challenge the GPS warrant.  It's not his phone.

4    It's not his phone number.  There's never been any

5    allegation of that.  So he doesn't have standing to

6    challenge the information of that warrant.

7          I think it's permissible for Mr. Bruder, as he has

8    done, to ask questions confirming the existence of someone,

9    but I think the longer it goes on, it has two risks.  One is

10   becoming identifying and the second is not relevant and

11   Mr. Smith doesn't have standing to challenge that warrant.

12         THE COURT:  Mr. Bruder, would you like to respond?

13         MR. BRUDER:  I would, Your Honor.

14         First of all, Your Honor, Mr. Smith does have

15   challenge -- does have standing to challenge the stop of the

16   automobile in which he was riding, which was predicated in

17   large measure on information from an individual who Officer

18   Schmitt has identified as a confidential reliable informant.

19         My questions at this point are going to the

20   informant's reliability, and the nature of the arrest is

21   relevant.  For example, if he was arrested as part of a

22   fraud investigation, it would suggest that the informant was

23   somebody who was comfortable lying, particularly lying to

24   police.  If he was arrested in connection with some other

25   type of investigation, it may show that he likely had

1   little, if any, connection with Mr. Ramey.

2          THE COURT:  I will instruct the witness to answer

3   with respect to the general nature of the investigation, in

4   other words, the crime under investigation if there was a

5   crime under investigation, to go that far.  But beyond that

6   we're going to take these questions very carefully one at a

7   time, and I may not let you go too much farther than that,

8   Mr. Bruder.

9   BY MR. BRUDER:

10  Q.  Do you recall the question, Officer Schmitt?

11  A.  Could you repeat it, please.

12  Q.  What was the nature of the investigation in which you

13  encountered the CRI?

14  A.  I believe it was a weapons-related investigation.

15  Q.  And when you contacted the CRI, how long after -- how

16  long was it after you became aware of this particular

17  shooting, that is the one involving Bam?

18  A.  I'm sorry, I'm not sure what the question was.

19  Q.  Well, at some point you were assigned responsibility for

20  trying to locate a suspect named Bam, correct?

21  A.  I was not assigned that responsibility.

22  Q.  Okay.  Well, maybe I'm confused then.

23          At what point did you become involved in the

24  investigation into Mr. Ramey's location?

25  A.  Once I learned that I had some relevant information to

1    provide in order to locate him.

2    Q.  Okay.  Approximately when was that, how long after the

3    shooting?

4    A.  I believe that I learned about the shooting within a

5    period of three or four hours.  And I believe that within a

6    period of less than six hours I had some information to

7    provide to the case.

8    Q.  And the information that you had to provide, was that

9    after you talked to your CRI or before?  That is, did you

10   tell the people involved in the investigation, hey, should I

11   reach out to the CRI or had you already done so?

12   A.  No, I did not speak to the investigator about the case,

13   about doing that.

14   Q.  So you contacted your CRI first and then went to the

15   case investigator?

16   A.  Yes.

17   Q.  Okay.  And what made you think that your CRI might have

18   some information about Mr. Ramey?

19          MS. HUDLESTON:  Your Honor, I'll just note my

20   continued objection that I think the Court issued a warrant

21   based on the CRI and the representations in the affidavit

22   and so there was an existing warrant that officers acted

23   according to, and the GPS data spoke for itself.  It showed

24   where that was coming back to.

25          So I don't think the CRI's history is really

1    relevant to the reasonableness of the mistaken identity

2    between Jamichael Ramey and Mr. Smith because they had a

3    warrant, they were there, and the pings were consistent with

4    the place they were surveilling.

5            So I don't think -- if I'm making sense, what got

6    them there I don't think there is relevance because

7    Mr. Smith doesn't have standing to challenge the process on

8    that phone number.  It wasn't his phone or his number.

9            THE COURT:  Mr. Bruder, would you like to respond?

10           MR. BRUDER:  Yes, Your Honor.  I have asked the

11   question that is at the core of determining the informant's

12   reliability.  I've asked the officer why he thought he had

13   some connection to Mr. Ramey; in other words, why he thought

14   he was a reliable informant.  And to say that the officer

15   doesn't have to answer that question essentially strips me

16   of my ability to investigate the informant's reliability.

17           And I'd add that while there may have been a GPS

18   warrant issued, the government hasn't bothered to introduce

19   it in this case, so you can't even examine it on a

20   four-corners test.  For the Court to have any information at

21   all about this informant I have to be allowed to ask these

22   questions.

23           THE COURT:  Well, did your motion challenge the

24   ping warrant?

25           MR. BRUDER:  Your Honor, I didn't even know --

1   well, let me back up.  I didn't know of the existence of a

2   confidential reliable informant at the time that I drafted

3   that particular motion.  I simply alleged that the stop of

4   the vehicle was unlawful.  I wasn't informed of the

5   existence of a CRI until, I would estimate, maybe 48 hours

6   ago.

7            THE COURT:  Let me have the court reporter read

8   back the question that Mr. Bruder had asked before we got

9   into the back and forth.

10           THE COURT REPORTER:  "Okay.  And what made you

11  think that your CRI might have some information about

12  Mr. Ramey?"

13           THE COURT:  I'm going to sustain the objection to

14  that question.

15  BY MR. BRUDER:

16  Q.  Before you called your CRI that evening, had the CRI

17  told you that he was acquainted with Mr. Ramey?

18  A.  Not that I can recall.

19  Q.  Had you previously used this particular CRI to provide

20  any information concerning other cases?

21  A.  Yes, I had.

22  Q.  Had you used him to provide information concerning cases

23  other than the one in which you arrested the CRI?

24  A.  Yes, I had.

25  Q.  And how many times had you used him before?

1    A.  I would have to assume -- or estimate somewhere in the

2    range of 25 to 30 times.

3    Q.  And in those 25 or 30 occasions, did he ever provide you

4    with information that proved to be inaccurate?

5    A.  I don't recall.

6    Q.  Had he been compensated for his services?

7    A.  Yes.

8    Q.  Was the CRI compensated for his services in this case?

9    A.  I believe he would've been.

10   Q.  Do you know how much he was compensated?

11   A.  I do not.

12   Q.  Who would have that information?

13   A.  The lieutenant of the Gun Investigation Unit would

14   likely have that information.

15   Q.  And his or her name?

16   A.  Lieutenant Schoenberger.

17   Q.  Now, you indicated that not long after you spoke to your

18   CRI he contacted you again and said that he had a telephone

19   number for Ramey, correct?

20   A.  Yes.

21   Q.  And he told you that he had just spoken to Ramey at that

22   number, correct?

23   A.  Yes, he did.

24   Q.  Did he give you any information about where Ramey was

25   located at that time, that is when he spoke with him?

1    A.  No.

2    Q.  Did he tell you how he had acquired the number he was

3    using to call Ramey?

4    A.  No.

5    Q.  Did he give you the number he was using to call Ramey?

6    A.  Did he give me the number that he called Ramey on?

7    Q.  Yes.

8    A.  Yes.

9    Q.  Do you recall what that number was?

10   A.  No, I don't.

11   Q.  Now, the telephone call between the CRI and Ramey, that

12   did not occur in your presence, it occurred somewhere else,

13   correct?

14   A.  Correct.

15   Q.  So you were relying on the accuracy of the information

16   provided to you by the CRI?  You weren't a witness to that

17   conversation, correct?

18   A.  That's correct.

19   Q.  Now, did you do anything to confirm the validity of the

20   information that was provided to you by the CRI?

21   A.  I ran -- I would've run the number in the CLEAR database

22   to confirm that it was a number and to find out who the

23   carrier was.

24   Q.  Would that CLEAR database show you who the subscriber --

25   identify the subscriber?

1    A.  It could.

2    Q.  Do you recall in this instance whether it identified the

3    subscriber or not?

4    A.  I don't recall.

5    Q.  Did you ever author any report in which you provided

6    that information for documentary purposes?

7    A.  I'm sorry?

8    Q.  Did you ever record in a report what your conversation

9    with the CRI consisted of; the number he provided to you,

10   where the CLEAR database showed who the subscriber was, if

11   it showed it at all?

12   A.  Okay.  I understand.  No.

13   Q.  Now, you indicated that the purpose of obtaining this

14   GPS tracking warrant would be to locate where the number was

15   pinging and from that you could determine an approximate

16   location, correct?

17   A.  It would give us the approximate location.

18   Q.  Okay.  And how accurate is that feature?  Does it

19   identify it within feet, yards, blocks?  How accurate?

20   A.  The accuracy radius that cell phone companies send out

21   are listed in meters.

22   Q.  I don't know if I can make the translation, but how many

23   meters?  What's the error range?

24   A.  It varies.

25   Q.  Well, what range have you seen?

1    A.  In this particular case?

2    Q.  This case is fine.

3    A.  Okay.  In this particular case, as I was reviewing some

4    of the data, I saw everything from 5 meters to 200 meters.

5    Q.  And when you were getting pings to this address on 33rd

6    Avenue, do you recall what the error range was from that

7    location?

8    A.  I do recall one in particular, which was the one right

9    before I didn't obtain two pieces of data, and that was a

10   five meter error radius.

11   Q.  So that generally indicated -- you said it was a

12   multi-unit apartment building, correct?

13   A.  Yes.

14   Q.  So that would, I think, let you know that it was

15   somewhere in the building but not exactly where.  Is that a

16   fair statement?

17   A.  Correct.

18   Q.  Now, you indicated that you began receiving information

19   from this tracking warrant sometime over the weekend, the

20   18th and 19th of July?

21   A.  I believe the tracking warrant went live on the 17th.

22   Q.  Okay.  And did the information you were receiving show

23   that the phone at least was moving around the Twin Cities?

24   A.  I recall that it -- I recall that the phone did move.

25   Q.  Do you recall any locations that you were getting, other

```
1    than this building on 33rd Avenue?

2    A.   No, I don't recall any of those other locations.

3    Q.   Was it pretty consistently recording a location at XXXXX

4    XXXXXXXXXXX throughout the weekend?

5    A.   I would say that it was consistent enough that it raised

6    that level of awareness that this was going to be a good

7    starting point for where the phone was most likely staying

8    for longer periods of time.

9    Q.   And why did you wait until the 20th to establish

10   surveillance on that location?

11   A.   I wasn't working on the weekend.

12   Q.   Okay.  So when you did establish surveillance, it was

13   when you went back to work on Monday morning?

14   A.   That's correct.

15   Q.   At some point, I assume prior to his arrest, you

16   received -- or you requested photographic -- photographs of

17   Mr. Ramey, correct?

18   A.   I just searched them out.  I didn't request them.

19   Q.   Okay.  And those are the photographs that were shown to

20   you by Ms. Hudleston as Exhibit 2, correct?

21   A.   Correct.

22   Q.   And from those photographs does Mr. Ramey have any

23   facial tattoos?

24   A.   Not that I can recall.

25   Q.   Okay.  And, as I recall, his hair was kind of either
```

1    dreadlocked or spiked.  Correct?

2    A.  Yes.

3    Q.  Now, you said that you didn't put a lot of stock in that

4    because it's easy enough to change one's appearance,

5    correct?

6    A.  Yes.

7    Q.  Okay.  And in at least one of the photographs Mr. Ramey

8    also had some facial hair, correct?

9    A.  I believe so.

10   Q.  And would that be the same for facial hair, you could

11   shave it off?

12   A.  Yes.

13   Q.  Now, of course, if you had no facial hair in any of the

14   photographs and he had a full beard a few days later, that

15   would be more relevant, correct?  If the person you were

16   looking at had a full beard a few days later, that would be

17   a little more relevant than the absence of facial hair,

18   correct?

19   A.  I guess depending on how fast it grows, yeah.

20   Q.  Okay.  Now, the photograph also provided some

21   information about Mr. Ramey's height and weight, correct?

22   A.  It did.

23   Q.  And as I recall from my review of Exhibit 2, he is 5'11"

24   and 172 pounds?

25   A.  I believe that's accurate.

```
1    Q.  Okay.  Did you ever check to see what Mr. Smith's height

2    and weight was after his arrest?

3    A.  I know now.

4    Q.  Oh, what is it?  What is it?

5    A.  I know that his height -- the height that he lists is

6    5'7".

7    Q.  About four inches shorter.

8              Do you recall the weight?

9    A.  I don't.

10   Q.  If I told you that a booking photograph I saw listed 138

11   pounds, would you dispute that?

12   A.  I won't dispute a booking photo.

13   Q.  So on July 20th -- that was the first time surveillance

14   was established at the address at XXXXXXXXXXXXXXXX, correct?

15   A.  Yes.

16   Q.  Now, you said -- in your testimony earlier you said that

17   you didn't have an address for Mr. Ramey, correct?

18   A.  I don't think that's an accurate description.

19   Q.  Okay.  Let me back up maybe.  You established

20   surveillance at XXXXXXXXXXXXXXX because, in your

21   estimation, that was his most likely location on July 20th;

22   is that correct?

23   A.  Yes.

24   Q.  Okay.  Now, Mr. Ramey -- I believe Ms. Hudleston

25   inquired and you responded -- had a lengthy criminal history
```

1    prior to his -- prior to this incident, correct?

2    A.  He had a criminal history.

3    Q.  Okay.  And at those times he would have presumably

4    provided police with a residential address, correct?

5    A.  I don't know.

6    Q.  Did you ever check to see if Mr. Ramey had previously

7    provided police with a residential address?

8    A.  I believe I did.

9    Q.  Okay.  And did you ever investigate to determine whether

10   he still lived at any of those addresses?

11   A.  To the best of my recollection, I believe that I've

12   looked for a couple of those addresses on the day of the

13   shooting.

14   Q.  Okay.  And when you say you "looked" for them, what does

15   that mean?

16   A.  Or I should say I drove to them.

17   Q.  Did you ring the doorbell and see if he answered?

18   A.  No.

19   Q.  Okay.  That would be a little risky, I assume.

20           What did you do to identify whether those

21   addresses were still valid addresses for Mr. Ramey?

22   A.  Very little.

23   Q.  And I would assume if you just drove to the address and

24   looked at the building, that wouldn't give you much

25   information, would it?

```
1     A.  Probably not.

2     Q.  I mean, you would have to hope that he actually was

3     walking in or out of the building to get reliable

4     information from that observation, correct?

5     A.  Potentially.

6     Q.  Now, do you recall what time of the day you established

7     surveillance at the XXXXXXXXXXXXXXXX location?

8     A.  I believe it was somewhere in the 9:00, 9:30 range.

9     Q.  Okay.  And at some point you identified a suspect

10    vehicle parked in front of the building, correct?

11    A.  Yes.

12    Q.  Was that at the time that you began your surveillance or

13    had you been surveilling the building for awhile before you

14    decided this might be a relevant vehicle?

15    A.  I don't recall.

16    Q.  Okay.  Now, if I recall correctly, you did receive

17    information about vehicles that had previously been

18    connected to Mr. Ramey, correct?

19    A.  Yes.

20    Q.  And that included a 2001 Honda Accord, correct?

21    A.  I believe so.

22    Q.  It also included a 2002 Chevrolet Tahoe, correct?

23    A.  I believe so.

24    Q.  And it included a 2008 Chevrolet Blazer?

25    A.  I believe so.
```

```
 1    Q.  Were any of those vehicles observed parked near XXXXX

 2    XXXXXXXXXXX?

 3    A.  No.

 4    Q.  Now, when you received information about vehicles that

 5    had been connected with Mr. Ramey, was a maroon GMC Envoy

 6    listed as a vehicle connected to Mr. Ramey?

 7    A.  No.

 8    Q.  Now, you were able to read the license plate number on

 9    that vehicle, correct?

10    A.  I believe so.

11    Q.  Did you run a license check to see who it came back to

12    as the registered owner?

13    A.  I think I probably did.

14    Q.  Okay.  Do you recall at this time what information you

15    derived from that search?

16    A.  I do not recall that.

17    Q.  Okay.  Is it likely you would've recalled it if it came

18    back registered to Mr. Ramey?

19    A.  Highly likely.

20    Q.  Okay.  Now, why is it that you identified the Tahoe

21    [sic] as a suspect vehicle, simply because it was parked in

22    front of that address?

23              THE COURT:  I'm sorry, the Tahoe?

24              MR. BRUDER:  I'm sorry, the GMC Envoy.  I

25    apologize, Your Honor.
```

```
1    BY MR. BRUDER:

2    Q.  Why is it you identified that as the suspect vehicle,

3    simply because it was parked in front of that address?

4    A.  No.  That vehicle was identified because we had

5    identified Mr. Smith and believed that he may be Ramey and

6    he left in that vehicle, so we established surveillance on

7    that vehicle as it left.

8    Q.  Well, when was it -- I thought you said you identified

9    it as a suspect vehicle while it was sitting in front of the

10   building.

11   A.  We identified vehicles at the building.

12   Q.  So you're saying that you actually did license checks on

13   all of the vehicles that were nearby?

14   A.  I would assume we did.

15   Q.  So there was nothing special about the vehicle search

16   for the GMC Envoy?

17   A.  Nothing at all.

18   Q.  It became a suspect vehicle only at the time that

19   Mr. Smith entered the vehicle?

20   A.  Yes.

21   Q.  Okay.  Now, you established a spot to observe the

22   building some distance away, correct?

23   A.  Correct.

24   Q.  Now, I think I understand, obviously, why you wouldn't

25   park in front of the building with binoculars.  That's a
```

1    little bit obvious.  Right?

2    A.  That would be obvious.

3    Q.  Okay.  But I'm assuming you had driven past the

4    building.  Correct?

5    A.  I would have driven past the building at some point,

6    yes.

7    Q.  Do you know whether there was more than one exit to the

8    building?

9    A.  The building would have a back door to it.

10   Q.  Okay.  And you stationed yourself where you could

11   observe the front door, correct?

12   A.  I did.

13   Q.  Okay.  So if somebody went out the back door, you would

14   not be able to observe that person?

15   A.  I would not.

16   Q.  Now, you indicated that you were approximately 125 yards

17   away from the building.  That would be 375 feet, correct?

18   A.  Okay.  I will agree with those numbers.

19   Q.  Okay.  And you were looking toward the building with

20   binoculars?

21   A.  Correct.

22   Q.  And from that distance away you were able to observe --

23   oh, and I forgot, you also mentioned that there were trees,

24   light poles, and traffic which interfered with your field of

25   vision at various points.  Correct?

1    A.   Potentially.

2    Q.   Okay.  And from that distance you identified an

3    individual that you thought might be Mr. Ramey, correct?

4    A.   Yes.

5    Q.   And you now understand that that individual in fact was

6    not Mr. Ramey but Mr. Smith, correct?

7    A.   That individual is identified as Mr. Smith.

8    Q.   Okay.  Now, you said that you had seen this individual

9    walking about the area?

10   A.   Yes.

11   Q.   Okay.  Do you recall exactly, specifically what he was

12   doing when he was walking around?

13   A.   I do not.  I recall that he was on foot.

14   Q.   Okay.  Did he appear to be skulking around or hiding

15   from people?

16   A.   Not to my recollection.

17   Q.   Okay.  And you noticed that he was wearing a black

18   jacket which you thought to be an Adidas jacket, correct?

19   A.   Yes.

20   Q.   In any way was he acting suspicious?

21   A.   Not that I can recall.

22   Q.   You indicated that he was a young, black male

23   approximately the same age as Mr. Ramey, correct?

24   A.   Yes.

25   Q.   And that is why you thought he might be Mr. Ramey,

1     correct?

2     A.  Correct.

3     Q.  Other than the fact that Mr. Smith happened to be a

4     young, black man, was there anything about him that made you

5     believe he had committed a crime?

6     A.  No.

7     Q.  Now, if I understand it correctly, at about the time

8     that Mr. Smith left the building there had been an

9     interruption in the information you were receiving from the

10    GPS warrant, correct?

11    A.  Correct.

12    Q.  Okay.  So for roughly 45 minutes there was no signal

13    data being delivered to you, correct?

14    A.  That's correct.

15    Q.  And in that period of time if the real Mr. Ramey had

16    left the building, he could've driven almost to New Prague

17    by the time that the new signal would come in, correct?

18    A.  New Prague?  Okay, I'll go with your distance in travel

19    on that.

20    Q.  All right.  You decided that when Mr. Smith came out of

21    the building, he was the most likely person to follow and so

22    you directed units to follow him, correct?

23    A.  Myself and Sergeant Lepinski.

24    Q.  Was Mr. Smith the only black man you saw go in and out

25    of the building during the time of the surveillance?

```
1    A.  I doubt it.  In fact, I know that the answer is no.

2    Q.  Okay.  You can recall at least one other black man

3    coming out of the building?

4    A.  Yes.

5    Q.  Would that be Mr. Armstrong?

6    A.  Yes.

7    Q.  So other than Mr. Armstrong and Mr. Smith that were

8    together, can you recall any other black person coming --

9    black man coming in and out of the building that morning?

10   A.  I don't recall.

11   Q.  Now, you did not actively follow the GMC Envoy as it

12   left the location, correct?

13   A.  I did not.

14   Q.  Okay.  Were the other case agents able to maintain

15   continuous contact with that vehicle as it drove away from

16   the location on 33rd Avenue?

17   A.  No.

18   Q.  So they lost track of it at some time as well, correct?

19   A.  Yes.

20   Q.  And in your testimony earlier today when Ms. Hudleston

21   was asking you questions, you made some reference to 33rd

22   Avenue North.  My understanding is that this apartment

23   building is located at XXXXXXXXXXXXXXXXX.  Correct?

24   A.  If I stated north, I misspoke and it would be 33rd

25   Avenue South as the location in question today.
```

1    Q.  And I think maybe you were trying to signal something

2    else.  You were north of the building, correct?  Your

3    surveillance location was to the north of the building on

4    33rd Avenue, correct?

5    A.  I was.  I don't know what I was trying to signal or when

6    I misspoke that.

7    Q.  Okay.  And do you recall when the Envoy left whether it

8    drove away to the north or to the south?

9    A.  I was no longer on surveillance at that time.

10   Q.  Okay.  Where had you gone?

11   A.  To the best of my recollection, I was to the west over

12   near the Bossen fields.

13   Q.  Okay.  So at some point you get more tracking data that

14   shows that the phone is now near 60th and Portland, correct?

15   A.  Yes.

16   Q.  Okay.  And it's at that point that the vehicles that had

17   been attempting to locate the Envoy congregated in that

18   area, correct?

19   A.  That is when they moved towards that location, yes.

20   Q.  And they followed the Envoy as it left the gas station

21   at 60th and Portland, correct?

22   A.  Yes.

23   Q.  And they made a stop at 42nd and Park, correct?

24   A.  That is where the officers conducted the stop.

25   Q.  Now, that's about 25 blocks away.  Do you know why they

1    waited that long to stop the vehicle?

2    A.  My belief is in order to get all of our -- or as many

3    resources as we could together.

4    Q.  You indicated that during a search of the vehicle that

5    narcotics were found in the center console; is that correct?

6    A.  That's correct.

7    Q.  Okay.  And they were all packaged essentially for

8    individual sale in some sort of a cellophane wrapping,

9    correct?

10   A.  That's how it appeared to me.

11   Q.  Do you know if that cellophane wrapping has ever been

12   fingerprinted to see if Mr. Smith's fingerprints are on it?

13   A.  The cellophane wrapping I do not think was.  The

14   container it was in was fingerprinted.

15   Q.  And did you look at the material when it was in the

16   vehicle or did you first see it when it was outside the

17   vehicle?

18   A.  Outside the vehicle.

19   Q.  Okay.  Now, you were told it was in a center console,

20   correct?

21   A.  Yes.

22   Q.  Do you know whether the officer had to open the console

23   to see it?

24   A.  I don't, but it should be fairly clear on the camera

25   information.

1    Q.  Did the vehicle belong to -- was the vehicle owned by

2    Mr. Smith or someone else?

3    A.  I don't recall off the top of my -- I'm sorry, the

4    vehicle did not belong to Mr. Smith.

5    Q.  And it was being driven by Mr. Armstrong, correct?

6    A.  Correct.

7    Q.  And was Mr. Armstrong ever charged with any controlled

8    substance offense arising from that methamphetamine?

9    A.  No.

10   Q.  Mr. Ramey subsequently pled guilty, so I assume he was

11   arrested.  Correct?

12   A.  He was.

13   Q.  Do you recall when he was arrested?

14   A.  I believe it was the 21st, but I'm not certain.  It

15   could've been the 22nd.  I left town.

16   Q.  So you were not involved in his arrest?

17   A.  I was not.

18   Q.  Do you know where Mr. Ramey was arrested?

19   A.  He was arrested, to the best of my recollection, near a

20   tent encampment area near 26th and Bloomington in

21   Minneapolis.

22   Q.  Now, Ms. Hudleston essentially concluded her examination

23   by asking you a series of questions about the nature of

24   Mr. Ramey's crime and having you testify somewhat obviously

25   that you and the other officers were executing all due

1    caution in making this arrest because of the nature of

2    Mr. Ramey's previous offense.  Do you recall that question?

3    A.  Something similar to that, yes.

4    Q.  Okay.  Now, when you were exercising all due caution,

5    you were also exercising all due caution in identifying the

6    persons inside the vehicle before pulling it over at

7    gunpoint?

8              (Pause.)

9              You don't need to answer that.

10             MR. BRUDER:  Just one minute, Your Honor.

11             (A brief discussion was held off the record.)

12             MR. BRUDER:  I have no further questions, Your

13    Honor.

14             THE COURT:  All right.  Ms. Hudleston, let me

15    check -- well, let me ask you, can you approximate how much

16    you have?  I want to make sure my court reporter doesn't

17    need a break right now.

18             MS. HUDLESTON:  Yes, Your Honor.  I think I have

19    about seven questions or so.

20             THE COURT:  Please go ahead, Ms. Hudleston.

21             MS. HUDLESTON:  Thank you.  I don't think I need

22    to the computer, so I'll try to sit here.

23             THE COURT:  All right.

24

25

SCHMITT - REDIRECT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDIRECT EXAMINATION**

**BY MS. HUDLESTON:**

Q.  Officer Schmitt, there was some questioning about the
CRI and the cell phone number that the CRI provided.  Do you
remember that?

A.  Yes.

Q.  And I think there was a little confusion about which
number you and Mr. Bruder were talking about.

       The CRI told you it was Ramey's phone number
because the CRI spoke to Ramey on that number, right?

A.  Yes.  So the CRI, you know, under initial questioning
about this case provided me with a phone number and then
shortly thereafter reached back out to me again and said
that they had spoken to Ramey on that phone number.

Q.  So he gave you a phone number associated with Ramey and
then called back to say in fact I just spoke to him on that
number, more or less?

A.  That's correct.

Q.  Mr. Bruder asked you about the phone moving around
somewhat on the weekend, but you look for not just movement
but a pattern of where something continues to show up, is
that right, for GPS locating?

A.  Yes.

Q.  And Mr. Bruder also asked you some questions about
Jamichael Ramey's height and weight as compared to

1    Mr. Smith's.  Do you remember that?

2    A.  Yes.

3    Q.  And can it be difficult to judge precise height and

4    weight in surveillance conditions?

5    A.  Yes, it can.

6    Q.  And, in fact, the footage that Mr. Bruder proposed for

7    how far you were away from XXXX is probably about or more

8    than a football field; is that right?

9    A.  Correct.

10   Q.  So from that distance and in the conditions you had on

11   July 20th, 2020, was it difficult to judge precise height

12   and weight?

13   A.  It was.

14   Q.  Now, Mr. Bruder also asked you about confirming a

15   previous address that Jamichael Ramey might have reported to

16   police, and I want to ask you if you have ping location data

17   or you have an address that a suspect once reported to

18   police, which is more reliable in finding someone or which

19   is more valuable to you I should say?  Which is more

20   valuable as an investigator?

21   A.  The GPS location data on the phone tracker is more

22   valuable to me.

23   Q.  And is that because it's more or less realtime location

24   of where the person is?

25   A.  Yes.

1    Q.  About the other vehicles that you heard -- or I guess

2    had information that might be associated with Jamichael

3    Ramey, do suspects tend to change their vehicles after being

4    involved in a shooting or a serious crime?

5              MR. BRUDER:  Objection, leading.

6              THE COURT:  Sustained.

7    BY MS. HUDLESTON:

8    Q.  What, if anything, do you make of vehicle information

9    tied to a suspect?

10   A.  I put very little reliability in it.

11   Q.  And why is that?

12   A.  It's been my experience that people change up cars, ride

13   with other people.  It's an easy to change method of

14   transportation.

15   Q.  And the question that Mr. Bruder asked you about

16   essentially other than being a black male, was there

17   anything about Mr. Smith that made you think he was involved

18   in a crime, do you remember that question?

19   A.  I do.

20   Q.  And it wasn't just that he was a young, black man, was

21   it?  It was that he was also near a house with cell phone

22   data, correct, or an apartment building?

23   A.  Correct.  It was a proximity issue.

24   Q.  And also multiple people thought he was a potential

25   match for the information you had on Jamichael Ramey, right?

1    A.  Multiple officers, yes.

2    Q.  So it wasn't just that he was a young, black man, it was

3    that there were corroborating facts; is that right?

4    A.  Correct.

5            MS. HUDLESTON:  I think that's it.  Thank you,

6    Your Honor.

7            THE COURT:  Mr. Bruder, anything further?

8            MR. BRUDER:  Just one or two questions, Your

9    Honor.

10           THE COURT:  All right.

11

12                    **RECROSS-EXAMINATION**

13   **BY MR. BRUDER:**

14   Q.  Officer Schmitt, you testified that multiple officers

15   thought Mr. Smith was a match with Mr. Ramey and that there

16   were other corroborating factors in this case.  Do you

17   recall that testimony?

18   A.  I don't know that we said he was a "match."  A "match"

19   would give us a guarantee.

20   Q.  Other than the fact that Mr. Smith was a young, black

21   man, what other corroborating factors existed that led you

22   to believe he was Mr. Ramey?

23   A.  The cell phone tracking data.

24   Q.  The fact that he was seen around XXXXXXXXXXXXXXXXXXXXXXX,

25   correct?

1    A.  More so the fact that he was seen there while the cell

2    phone was tracking there and then again seen in tandem as

3    the cell phone tracked to the new location of 60th and

4    Portland where we again put eyes on him.

5    Q.  And focusing on the area around XXXXXXXXXXXXXXXXXXXXXXX,

6    that specific address is a multi-unit apartment building,

7    correct?

8    A.  It is.

9    Q.  Located near a commercial district and other multi-unit

10   apartment buildings, correct?

11   A.  Not a commercial district, but multiple apartment

12   buildings.

13           MR. BRUDER:  I have no further questions.  Thank

14   you.

15           THE COURT:  Anything further, Ms. Hudleston?

16           MS. HUDLESTON:  No.  Thank you, Your Honor.

17           THE COURT:  All right.  You may step down, Officer

18   Schmitt.

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  And your next witness?

21           MS. HUDLESTON:  Yes.  Thank you.  The United

22   States calls Sergeant Adam Lepinski.

23           THE COURT:  Please raise your right hand.

24                   (Witness sworn.)

25           THE COURT:  Please be seated.

1          THE WITNESS:  May I remove my mask, Your Honor?

2          THE COURT:  You may.  And please state your full

3    name and spell your last name.

4          THE WITNESS:  My name is Adam Lepinski.  My last

5    name is spelled L-E-P-I-N-S-K-I.

6          THE COURT:  Please go ahead, Ms. Hudleston.

7          MS. HUDLESTON:  Thank you, Your Honor.

8

9    **ADAM LEPINSKI**

10                      **DIRECT EXAMINATION**

11   **BY MS. HUDLESTON:**

12   Q.  Sergeant Lepinski, what do you do for a living?

13   A.  I am a police sergeant with the Minneapolis Police

14   Department.

15   Q.  How long have you been with MPD?

16   A.  Just over 17 years.

17   Q.  What are your primary duties?

18   A.  I'm currently assigned as a sergeant with the

19   Minneapolis Police Gun Investigations Unit.

20   Q.  Were you also a sergeant with the Gun Investigation Unit

21   last July of 2020?

22   A.  Yes, Ma'am, I was.

23   Q.  I am going to take you back to July 20, 2020.  Were you

24   working that day?

25   A.  Yes, I was.

1    Q.  Were you working a particular investigation?

2    A.  Yes.

3    Q.  Which one?

4    A.  I was assisting Officer Schmitt, also from the Gun

5    Investigations Unit, with attempting to locate and apprehend

6    an individual named Jamichael Ramey.

7    Q.  And why were you attempting to locate and apprehend him?

8    A.  Mr. Ramey was a suspect in a shooting that had happened

9    a couple days prior in South Minneapolis.  We were

10   attempting to locate him and arrest him for that incident.

11   Q.  Have you ever seen Jamichael Ramey in person?

12   A.  I had not.

13   Q.  Did you receive some information about him?

14   A.  Yes.

15   Q.  Showing you Government Exhibit 2, did you receive these

16   photographs and this target information as part of an

17   operations briefing?

18   A.  Yes, I did.

19   Q.  And did you also get some information about his criminal

20   history and the crime under investigation?

21   A.  Yes.

22   Q.  What were you doing on July 20th, 2020 to try to find

23   Jamichael Ramey?

24   A.  Officer Schmitt was tracking a cell phone related to the

25   investigation, and my role for that specific day was to act

1    as a surveillance officer, surveillance capacity.  So I was

2    dressed in plain clothes.  I was driving an unmarked police

3    vehicle so I could properly do my surveillance without

4    easily being identified as an officer.

5    Q.  And where were you on surveillance that day?

6    A.  We were surveilling an apartment building far south in

7    Minneapolis right off the Crosstown area by the airport.

8    The actual address was XXXXXXXXXXXXXXXXXXXXXX.

9    Q.  And why were you stationed there?  Why were you

10   targeting that apartment?

11   A.  That's where Officer Schmitt had directed us to go

12   conduct surveillance, the reason being that was where the

13   cell phone that he was tracking was plotting to.

14   Q.  And you said you were on site there at that address; is

15   that right?

16   A.  Yes, Ma'am, I was.

17   Q.  I'm just going to show you Government Exhibit 10.  Do

18   you recognize the building on the left as that address?

19   A.  Yes, I do.

20   Q.  And where were you positioned in relation to that

21   apartment building?

22   A.  I was to the north of that apartment building, and I was

23   in my unmarked vehicle, and I was facing south.

24   Q.  And I'm going to show you Government Exhibit 12.  Do you

25   remember what address on XXXXXXXXXXXXXXXXX you were in front

1     of?

2     A.   Yes, I do.

3     Q.   What is that?

4     A.   XXXXXXXXXXXXXXXXXXXXXXX.

5     Q.   Okay.  I'm going to show you Government Exhibit 11,

6     which is a Google street photo.  And on the right there do

7     you recognize this building?

8     A.   Yes, I do.

9     Q.   What is that?

10    A.   That is XXXXXXXXXXXXXXXXXXXXXXX.

11    Q.   Okay.  So you were near that building looking down the

12    street toward the target address?

13    A.   That's correct.  I was parked right in front of that

14    address looking south near that short retaining wall there.

15    Q.   And I'm now going to show Government Exhibit 12.  Did

16    you take this photo recently to give an idea of kind of what

17    your angle and viewpoint was that day?

18    A.   Yes, I did.  I took this photograph yesterday.  This was

19    the exact location where I was parked when I was conducting

20    surveillance on July 20th, 2020.

21    Q.   And we don't have a circling ability on these monitors,

22    but we saw that XXXX is the farthest apartment down on the

23    left there on the corner; is that right?

24    A.   That is correct.

25    Q.   And why were you stationed a fair ways back near XXXX?

1    A.  Well, a couple reasons.  I didn't want to be seen by the

2    suspect that we were looking for in the event that he was

3    indeed looking for law enforcement in the area.  I'm not

4    sure if he knew that he had been identified as a suspect.  I

5    don't know if he knew that law enforcement was looking for

6    him, but oftentimes that is the case where we're trying to

7    apprehend someone that knows that they are wanted.  So they

8    will be actively looking for law enforcement.  So I want to

9    stay a ways away so I'm not spotted.  And also just the area

10   is relatively busy down there with a lot of activity.  And I

11   wanted to make sure I was a distance away.

12   Q.  So that you wouldn't be identified?

13   A.  Yes.

14   Q.  And did you have a view of the front door of XXXXXXXXX?

15   A.  I would say I had more of a view of the front sidewalk

16   area directly in front of the actual building and the

17   street, of course.

18   Q.  And what did you see that day, on the 20th, last year?

19   A.  On that day I saw an individual leave the building or

20   walk away from the yard that leads up to the front door of

21   the XXXX building.

22        And I also saw a vehicle that was later stopped.

23   It was a GMC Envoy that was maroon in color.  The individual

24   that I observed got into that vehicle and eventually

25   departed the area.

1   Q.  And where was that GMC Envoy parked when you saw it?

2   A.  It was parked directly in front of XXXXXXXXXXXXXXXXX

3   XXXXX.

4   Q.  And did you see someone you thought might be Jamichael

5   Ramey?

6   A.  Yes, I did.

7   Q.  Who was that?

8   A.  It's an individual who I now know as Romelle Smith.

9   Q.  And is it the person who you just referenced you saw

10  leave the building and get into that Envoy at one point?

11  A.  Yes, Ma'am.

12  Q.  Was he alone?

13  A.  He was with another male eventually in the vehicle.  But

14  I saw Mr. Smith leave the building alone.  Eventually, he

15  became the front-seat passenger in that GMC.  So he was with

16  one other male.

17  Q.  Were you able to see Mr. Smith's face -- well, who we

18  now know as Mr. Smith, who you thought was Jamichael

19  Ramey -- were you able to see his face?

20  A.  I was able to see his face from a distance.  I was

21  utilizing a piece of equipment that I normally use, which is

22  binoculars.  I use those on a regular basis to assist me.

23  So I was able to see his face but not up close like you and

24  I are.  It was from a ways away.

25  Q.  Did you notice any tattoos on his face?

1    A.  I did not.

2    Q.  And what did you think you were seeing when you saw him

3    leave the building and get into that Envoy?

4    A.  Based on the physical description I had received, as

5    well as the information that was given to me about the phone

6    ping, the phone location, and my observations of Mr. Smith,

7    I believed at that time that it was the suspect that we were

8    looking for, Mr. Ramey.  And I provided that information to

9    other officers via our portable radios.

10   Q.  So you broadcast that you thought you just had seen

11   Ramey leave the building; is that right?

12   A.  That's correct.

13   Q.  And did you broadcast also the GMC Envoy and its

14   information?

15   A.  Yes.  That's correct.

16   Q.  Now, what was happening with the ping data during this

17   time?

18   A.  There were some pings that came and showed the phone at

19   the target apartment building.  There was also some phone

20   pings that came in with no location information.

21        So there was a couple -- they only come every 15

22   minutes, so I believe there was two or three that came in

23   with no location information whatsoever.  And then at one

24   point the phone was providing location after several times

25   of not having any location data.

1    Q.  And what happened after you saw the Envoy leave and you

2    aired the information on police radio that you thought your

3    suspect was leaving?

4    A.  So at that time I was considered what we consider the

5    main eye.  So I was the main officer that had the

6    surveillance on the building.  Other officers were in the

7    area, of course, assisting.  But since I was the main eye, I

8    didn't participate in trying to follow the GMC as it

9    departed the area.  I kept in my position watching the

10   building.  Other officers attempted to follow the GMC.

11   Q.  Do you know when the ping data came back on, was it

12   consistent or not consistent with the GMC's location?

13   A.  It was consistent.

14   Q.  And did you eventually learn that police had stopped

15   that GMC Envoy?

16   A.  Yes, Ma'am.

17   Q.  And you've learned, of course, that the passenger was

18   actually Mr. Romelle Smith?

19   A.  Yes.

20   Q.  Did you have any further involvement in the case after

21   that day?

22   A.  No, I did not.

23              MS. HUDLESTON:  Thank you.  Nothing further.

24              THE COURT:  Mr. Bruder.

25              MR. BRUDER:  Thank you, Your Honor.

1

2                        **CROSS-EXAMINATION**

3      **BY MR. BRUDER:**

4      Q.  Sergeant Lepinski, you indicated that on July 20th you

5      at some point became the main eye, correct?

6      A.  Yes, that is correct, sir.

7      Q.  Did you have that responsibility throughout the

8      surveillance or did you transition into that responsibility

9      at some time after the surveillance began?

10     A.  I transitioned at some point after the surveillance had

11     began that day.

12     Q.  And do you recall at what time you began your turn as

13     main eye?

14     A.  I don't recall the exact time, sir, but it was around

15     10:30, 11:00 is what I believe.

16     Q.  And you said that you parked in front of XXXXXXXXXX

17     XXXXXXXXXXXX, correct?

18     A.  That is correct.

19     Q.  And do you have any estimate of how far in distance that

20     would be from the building at XXXXXXXXXXXXXXXX?

21     A.  I would estimate it's approximately a half block to

22     three-quarters of a block to the north of the target

23     building.  And it would be on the opposite side of the

24     street, so the west side of XXXXXXXXXXX.

25     Q.  Do you have any idea of how far that would be in feet?

1    A.  I'm sorry, sir, I don't really.

2    Q.  Okay.  And I think what you testified to was that you

3    had a view of the sidewalk in front of the building, perhaps

4    not a very clear view of the front door.  Is that correct?

5    A.  That is correct.

6    Q.  And my understanding is that there's also a rear

7    entrance to the building.  Is that correct?

8    A.  Yes, that's correct.

9    Q.  And would you have been able to see the rear entrance at

10   all from where you were?

11   A.  Not from my vantage point, no, sir.

12   Q.  You mentioned that there's a lot of activity in that

13   area.  Can you describe what kind of activity we're talking

14   about.

15   A.  There is a lot of activity in that area,

16   narcotics-related activity.  There is, unfortunately, a lot

17   of violent crime that occurs in that area as well.

18   Q.  So you weren't referring to foot traffic and vehicle

19   traffic?  That's what I thought you were talking about.

20   A.  That as well, sir.  There's vehicle traffic and

21   pedestrian traffic.  It's a highly-populated area given the

22   fact that it's all apartments.  There is not single-family

23   residences.  There's lots of tenants and rental properties

24   that are kind of jammed into a small geographical area.

25   Q.  And I believe you said that Officer Schmitt had been the

1    main eye when you took over your responsibility?

2    A.  Yes, sir.

3    Q.  Did he give you any sort of a debriefing before you

4    began?

5    A.  Not that I recall.

6    Q.  Did he tell you that he had seen somebody in a black

7    Adidas jacket that he thought might be a viable suspect?

8    A.  I don't recall that, sir, no.

9    Q.  How long had you been acting in the capacity of the main

10   eye before you saw Mr. Smith -- the person you now know as

11   Mr. Smith near the building?

12   A.  It was not that long.  Again, I'm just estimating; I

13   apologize.  It was less than an hour I would estimate.

14   Q.  Okay.  Had you seen anybody else enter or exit the

15   building while you were surveilling it?

16   A.  Yes, there were other individuals.  No one that drew my

17   attention to the point that I thought maybe it was our

18   suspect.  There was other people around, but they didn't

19   look like our suspect, so I didn't pay them any attention.

20   Q.  Do you recall anything about the other people that you

21   had disregarded?

22   A.  I really don't, sir.  I'm sorry.

23   Q.  What was it that made you notice Mr. Smith?

24   A.  His physical build was similar to the suspect,

25   Mr. Ramey, in terms of his weight, height, skin complexion,

1    as well as his hair was similar.

2    Q.  Did you have an opportunity to see a photograph of

3    Mr. Ramey before you went to the site?

4    A.  Yes.

5    Q.  And did you look at it?

6    A.  Yes, I did.

7    Q.  Okay.  The photograph has previously been shown.  And

8    Mr. Ramey has kind of spiked or dreadlocked-type hair.  Is

9    that what Mr. Smith's hair looked like that day?

10   A.  No, it was slightly shorter than that.

11   Q.  And Mr. Smith, at least appears to me as he sits next to

12   me today, appears to be a relatively dark-skinned

13   individual.  Is that what you believed Mr. Ramey looked

14   like?

15   A.  They were both African-American males.  I believe they

16   were similar in skin complexion from my distance.

17   Q.  And you said they had a similar build?

18   A.  Yes.

19   Q.  Do you recall what Mr. Ramey's height and weight was?

20   A.  I believe Mr. Ramey was 5'11", if I remember correct,

21   and approximately 140, 150 pounds.  I don't recall the exact

22   number, but it was around that general weight.

23   Q.  172 sound possible?

24   A.  That's possible.  In my mind, it was just kind of a

25   medium build.  I don't get into the exact weight number, but

1    a medium build versus very skinny versus very large.

2    Q.  Do you know how tall Mr. Smith is?

3    A.  I believe he is -- I've seen his demographics on the

4    report, so I know that he is 5'7", at least according to the

5    police report.

6    Q.  But they both appear to be about the same age?

7    A.  Yes.

8    Q.  Do you recall while you were observing the building if

9    you saw any other young, black men coming in or out of the

10   building while you were observing it?

11   A.  I don't recall exactly, sir.

12   Q.  As Mr. Smith exited the building, did he do anything

13   that struck you as suspicious?

14   A.  Mr. Smith was observed -- I observed him on the sidewalk

15   near the chain link fence.  He was standing there for awhile

16   kind of walking back and forth.  I wasn't really sure what

17   exactly he was doing.  So I watched him with my binoculars.

18   I observed him wearing a black Adidas jacket with some white

19   stripes down the side.

20   Q.  At any time had Officer Schmitt told you that you should

21   try to pay attention to anyone wearing a black Adidas

22   jacket?

23   A.  I don't recall that, sir.

24   Q.  You said that Mr. Smith got into a maroon GMC Envoy

25   automobile?

1    A.  Yes.

2    Q.  Was he the driver?

3    A.  He was not.

4    Q.  He was the passenger?

5    A.  Correct, front-seat passenger.

6    Q.  And did the driver come out at the same time as

7    Mr. Smith or did he come out at a different time?

8    A.  I don't recall that exactly.  When I saw Mr. Smith come

9    out, I saw him alone.  I'm not sure if the driver,

10   Mr. Armstrong, came out of the back or the front.  I don't

11   recall that exactly.

12   Q.  So it could be that he was simply waiting for the driver

13   to arrive?

14   A.  That is entirely possible.

15   Q.  As he stood by the chain link fence, did Mr. Smith

16   appear to be trying to hide in any way?

17   A.  No.

18   Q.  Could you see whether Mr. Smith had any facial hair at

19   the time?

20   A.  No, I could not.

21   Q.  And I'm assuming that your ability to observe or

22   identify Mr. Smith was to some degree impeded by the

23   distance that you were from the building at XXXX, correct?

24   A.  Yes, sir.

25   Q.  And it was also impeded by the fact that you were

```
1    looking at it from an angle and there were trees and light
2    poles and that sort of thing in the vicinity?
3    A.  Correct.
4    Q.  Did you have any involvement in this case after you
5    observed the vehicle drive away from XXXXXXXXXXXXXXXX?
6    A.  No, I did not.
7    Q.  Now, were you the one who instructed -- there were other
8    officers, besides you, assigned to the surveillance that
9    day, correct?
10   A.  Correct.
11   Q.  Were you the one that instructed the other officers to
12   follow this vehicle or did Officer Schmitt give that
13   instruction?
14   A.  I believe that was Officer Schmitt.  Even though I was
15   the supervisor of the unit or one of the two supervisors on
16   the detail there, it was Officer Schmitt whose investigation
17   it was and that would have been his call.  He has access to
18   the phone data, and it would be his decision whether to
19   follow the vehicle or not.  I'm just merely reporting what
20   I'm seeing as the main eye.
21   Q.  So you were simply saying that you had seen these two
22   people get into the Envoy and drive away, and Officer
23   Schmitt made the decision that the other officers were going
24   to follow that vehicle?
25   A.  Yes, sir.  That's correct.
```

1   Q.  Had you done anything to identify the GMC Envoy that was

2   parked in front of the building at XXXX as any kind of a

3   vehicle that warranted special attention while you were

4   sitting there before the people got into it?

5   A.  From my angle I didn't have a view of the license plate.

6   So other than just being able to see the make, model, and

7   color of the vehicle, I wasn't able to provide information

8   as to like the registration of the vehicle or anything like

9   that.

10          At one point when the vehicle did leave, I was

11   able to get the license plate, but I didn't have access to

12   like a squad computer or anything like that to do those

13   checks myself, if that makes sense.

14   Q.  Okay.  So you didn't personally check to see who it came

15   back to, correct?

16   A.  That's correct.  I did not.

17   Q.  You don't have any information whether it was connected

18   to Ramey in any way?

19   A.  That's correct, I do not have that information.

20   Q.  Okay.  Did anyone ask you to look at the vehicles that

21   were parked near XXXX to determine if any of them had any

22   connection to Ramey?

23   A.  No.

24   Q.  And, in fact, since you didn't have access to a

25   computer, you would have been a particularly poor choice to

1    do that, right?

2    A.  Yes, sir.

3              MR. BRUDER:  I have no further questions of you.

4    Thank you.

5              THE WITNESS:  Thank you.

6              THE COURT:  Ms. Hudleston, anything further for

7    this witness?

8              MS. HUDLESTON:  Just maybe one or two questions.

9

10                      **REDIRECT EXAMINATION**

11   **BY MS. HUDLESTON:**

12   Q.  Sergeant Lepinski, when Mr. Bruder asked you some

13   questions about a photo of Jamichael Ramey, do you remember

14   that?

15   A.  Yes, I do.

16   Q.  Do you recall that when we looked at Exhibit 2, there

17   were two photos of Mr. Ramey?

18   A.  Yes, there were two photos side by side.

19   Q.  You recall in one his hair was longer and one his hair

20   was shorter?

21   A.  Yes.

22   Q.  And regarding the differences in height and weight

23   between Mr. Smith and Mr. Ramey, from your distance and the

24   surveillance conditions you were under, was it hard to be

25   very precise about height and weight?

83

 1   A.  Yes, indeed, it was.  Yes.

 2              MS. HUDLESTON:  Nothing further, Your Honor.

 3              THE COURT:  Mr. Bruder, anything further?

 4              MR. BRUDER:  Nothing further, Your Honor.

 5              THE COURT:  All right.  Sergeant Lepinski, you may

 6   step down.

 7              THE WITNESS:  Thank you, Your Honor.

 8              THE COURT:  Ms. Hudleston, how long do you

 9   anticipate the next witness?  We've been going a couple of

10   hours.  I'm thinking it may be time to take a break.

11              MS. HUDLESTON:  A break sounds good.

12              THE COURT:  We will break until 3:45.

13                   (A brief recess was taken.)

14              THE LAW CLERK:  All rise.  Court is now in

15   session.

16              THE COURT:  Please be seated.

17              We're back on the record in the United States v.

18   Romelle Smith.

19              Ms. Hudleston, I believe you were going to call

20   your next witness.

21              MS. HUDLESTON:  Yes, Your Honor.  The third and

22   final witness the government calls is Sergeant Andrew

23   Schroeder.

24              Your Honor, if I may, in light of the some of the

25   testimony that Mr. Bruder has solicited on cross, I would

1    like to mark an additional government exhibit.

2             THE COURT:  Have you shown this to Mr. Bruder?

3             MS. HUDLESTON:  I can show it to him now.

4             THE COURT:  I think that would be appropriate.

5             MS. HUDLESTON:  If we could have the monitors off.

6             Mr. Bruder, if you wouldn't mind joining me up

7    here.

8             (A brief discussion was held off the record.)

9             MS. HUDLESTON:  So, Your Honor, I'll offer and

10   mark as Exhibit 13 the clip of body-worn camera footage that

11   I'll submit to the Court after this hearing.

12            THE COURT:  And for the record, Mr. Bruder just

13   viewed it.  Is it information that had been previously

14   produced to Mr. Bruder in discovery?

15            MS. HUDLESTON:  It has.  This, I think, is one of

16   the ones where the other person's camera I produced to with

17   Mr. Smith's statements because some of this camera contained

18   confidential information.  But it's been made available for

19   inspection.  And certainly the statements have been

20   produced, yes.

21            THE COURT:  All right.  And, Mr. Bruder, do you

22   have any objection?

23            MR. BRUDER:  I have no objection to the

24   foundation, Your Honor, or its admissibility.  I may argue

25   that it has limited relevance, but that's to the weight,

1    rather than the admissibility in this proceeding.  I have

2    seen the video before.

3                    THE COURT:  All right.  Very well.  Thank you.

4                    Actually, I'm going to ask you -- just so we have

5    a record, I'm going to ask you to describe Government

6    Exhibit 13 just a little more clearly.

7                    MS. HUDLESTON:  Certainly, Your Honor.  It is a

8    video that is entitled "stop_and_arrest_clip2."

9                    THE COURT:  And you're saying it's body-worn

10   camera footage?

11                   MS. HUDLESTON:  It is body-worn camera footage

12   from July 20th, 2020 at approximately 12:19 to 12:21 p.m.

13                   THE COURT:  All right.  Thank you.

14                   So in the absence of objection from Mr. Bruder,

15   then Government Exhibit 13 is admitted for purposes of this

16   hearing.

17                   And I'll swear in Sergeant Schroeder.

18                           (Witness sworn.)

19                   THE COURT:  All right.  Please be seated.

20                   THE WITNESS:  Thank you.

21                   THE COURT:  And please state your full name --

22   yes, thank you, you can remove your mask.

23                   THE WITNESS:  Thank you.

24                   THE COURT:  Please state your full name and spell

25   your last name for the record.

```
 1                THE WITNESS:  Yes, Your Honor.  My name is Andrew
 2       Schroeder, S-C-H-R-O-E-D-E-R.
 3                THE COURT:  Ms. Hudleston, you can go ahead.
 4                MS. HUDLESTON:  Thank you, Your Honor.
 5
 6       ANDREW SCHROEDER
 7                          DIRECT EXAMINATION
 8       BY MS. HUDLESTON:
 9       Q.  Sergeant Schroeder, what do you do for a living?
10       A.  I am a police officer for the City of Minneapolis.
11       Q.  How long have you done that?
12       A.  Since late 2014.
13       Q.  What are your primary duties?
14       A.  Currently, I'm assigned to the Gun Investigation Unit as
15       an investigative sergeant.
16       Q.  And were you also in the Gun Investigation Unit last
17       July 2020?
18       A.  Yes, Ma'am.  At that time I was an officer.
19       Q.  Okay.  And were you working on July 20th, 2020?
20       A.  Yes, Ma'am.
21       Q.  Were you working with a partner?
22       A.  Yes, Ma'am.
23       Q.  Who was that?
24       A.  Officer Jesse Standal.  I believe that's S-T-A-N-D-L.
25       Q.  And were you in a squad car or unmarked?
```

1    A.  I believe we were in a marked squad car.

2    Q.  And were you involved in an investigation that day?

3    A.  Yes, Ma'am.

4    Q.  Which investigation?

5    A.  It was an investigation -- I had limited knowledge of

6    the investigation, just that we were going after a suspect

7    for a shooting.  The case agent was Officer Jay Schmitt.

8    Q.  Did you get a name of the suspect?

9    A.  I did.

10   Q.  What was his name?

11   A.  His last name was Ramey, Rainey, something similar.

12   Q.  And showing you Government Exhibit 2 -- Jamichael Ramey,

13   does that ring a bell?

14   A.  Yes, Ma'am.

15   Q.  And do you recall receiving operation plans from Officer

16   Schmitt?

17   A.  I do.

18   Q.  And did you get, as part of that updated operation plan,

19   this duo of photos as well as this target information?

20   A.  Yes, Ma'am.

21   Q.  And on that target information there was the suspect's

22   age and race and some height and weight information; is that

23   right?

24   A.  Correct, Ma'am.

25   Q.  What, if anything, did you know about a ping warrant

1    involving the case?

2    A.  Not much.  I knew there was one.  But other than that, I

3    didn't have any information about that.

4    Q.  But you knew there was some cell phone tracking going

5    on, right?

6    A.  Exactly right.  Yes.

7    Q.  And what were you and Officer Standal doing that morning

8    of July 20, 2020 for this investigation?

9    A.  So as part of this investigation, there were

10   plain-clothes surveillance officers attempting to locate

11   Mr. Ramey.

12           My job on this day was to be in a police car.  So

13   if potentially Mr. Ramey was located, we would be the

14   persons stopping Mr. Ramey.

15   Q.  And did something happen with the case that day, July

16   20th, 2020?

17   A.  Yes, Ma'am.

18   Q.  What happened?

19   A.  At some point during the investigation, surveillance

20   officers were talking on the radio that they believed they

21   had observed this suspect in a vehicle.  They described the

22   vehicle.  They followed the vehicle and eventually asked

23   Officer Standal and I to stop the vehicle with the police

24   car.

25   Q.  Did other officers assist in the stop?

```
1    A.  Yes, Ma'am.

2    Q.  And what did you do when you heard that you were being

3    asked to stop the vehicle?

4    A.  Officer Standal and I proceeded to drive to the area

5    where the officers were following this vehicle, and

6    eventually we turned on our police lights and stopped the

7    vehicle.

8    Q.  And where was that area?

9    A.  42nd and Park Avenue in South Minneapolis.

10   Q.  And when you stopped the vehicle, did you approach it?

11   A.  Yes, Ma'am.

12   Q.  And what did you do?  What was your role?

13   A.  I went to the passenger side of the vehicle where I

14   ultimately, you know, detained this male.

15   Q.  What did you see when you approached the passenger side?

16   A.  When I approached the passenger side, I opened the door

17   about to arrest who I thought was this Mr. Ramey and I made

18   contact with Mr. Smith who was holding some marijuana in his

19   hand.  He was cooperative.  And ultimately he was

20   handcuffed.

21   Q.  And during that process, did Mr. Smith mention something

22   about having a weapon in his possession?

23   A.  He did.

24   Q.  What did he say?

25   A.  He said something along the lines of I have something in
```

1    my pocket.

2    Q.  And when you approached the vehicle, did you have your

3    weapon drawn?

4    A.  Of course.

5    Q.  And why do you say "of course"?

6    A.  I believed I was making contact with somebody that had

7    recently committed a shooting, obviously, with a firearm.

8    So I had my firearm out for my safety, as well as other

9    officers' safety.

10   Q.  And did other officers do the same?

11   A.  I believe so.

12   Q.  I'm going to show you Government Exhibit 3-A, which

13   you'll see is some footage of the arrest.

14              (Government Exhibit 3-A video played.)

15   BY MS. HUDLESTON:

16   Q.  Sergeant Schroeder, do you recognize that body camera as

17   your footage?

18   A.  Yes, Ma'am.

19   Q.  And is that some of the sequence of events we've just

20   talked about?

21   A.  Exactly right, Ma'am.

22   Q.  Now, as you approached that GMC Envoy, who did you think

23   it was in the passenger seat?

24   A.  Mr. Ramey.

25   Q.  And as you were approaching the car -- it sounds like

1    you were coming in from the back.  Is that right?

2    A.  Yes, Ma'am.

3    Q.  And when did you first realize it might be someone else

4    other than Mr. Ramey?

5    A.  Once he was out of the car and, I guess, told me his

6    name.

7    Q.  And we saw he had something in his hand, and you

8    mentioned he had some marijuana in his hand.  Correct?

9    A.  Yes, Ma'am.

10   Q.  Is that right?

11   A.  Yes, Ma'am.

12   Q.  And did you run the name Romelle Smith in your database?

13   A.  Eventually, yes, Ma'am.

14   Q.  What did you find out?

15   A.  He had a felony warrant for his arrest.

16   Q.  Did you place him in your squad car?

17   A.  Yes, Ma'am.

18   Q.  Did you then help search the Envoy?

19   A.  Yes, Ma'am.

20   Q.  And showing you Government Exhibit 1, is this the Envoy

21   once it's been pulled over to the side of the road?

22   A.  Correct.

23   Q.  Now I'm going to show you Government Exhibit 3-B

24   theoretically.

25                  (Government Exhibit 3-B video played.)

1     BY MS. HUDLESTON:

2     Q.  And what did we just see there?

3     A.  You saw me searching part of the Envoy where I located

4     in the -- I would call it the armrest; it was like a blue I

5     would call it a Tupperware container, similar that contained

6     what I suspected to be cocaine.

7     Q.  Okay.  And showing you Government Exhibit 7, is that

8     what you saw?

9     A.  Exactly right.

10    Q.  And did you take that photo of the center part of the

11    Envoy there?

12    A.  I believe so.  Yes, Ma'am.

13    Q.  What did you do with the suspected drugs?

14    A.  It was recovered and later inventoried as evidence.

15    It's possible I gave it to another officer to inventory.

16    Q.  Did you transport Mr. Smith down to jail?

17    A.  Yes, Ma'am.

18    Q.  And during the ride down there, did he speak with you a

19    bit about various things?

20    A.  Yes, Ma'am.

21    Q.  And was one of those things the identity of the shooting

22    suspect?

23    A.  It was.

24    Q.  I'm going to now play newly-marked Government Exhibit

25    13.

1          MS. HUDLESTON:  It's a little hard to hear at

2     times so -- was it better when I had the mic, Your Honor,

3     coming from my computer or with the plug-in?

4          THE COURT:  I think the plug-in was -- was that

5     what you tried second?

6          MS. HUDLESTON:  Second.

7          THE COURT:  I think that was a little clearer.

8          MS. HUDLESTON:  I had unplugged it to show

9     Mr. Bruder.  I have the volume up, so we'll do our best

10    here.  I'm going to move it to about the one minute mark in

11    Government Exhibit 13.

12               (Government Exhibit 13 video played.)

13          MS. HUDLESTON:  I'm going to pause it there at the

14    3:13 mark.

15    BY MS. HUDLESTON:

16    Q.  Do you recall that, Officer Schroeder?

17    A.  Yes, Ma'am.

18    Q.  And it was a little hard to hear Mr. Smith on there, but

19    is it fair to say you were repeating into the radio what

20    Mr. Smith was telling you at the time?

21    A.  That's correct.  Yes, Ma'am.

22    Q.  And what was he telling you about the shooting and the

23    suspect?

24    A.  He just was aware of the shooting.  He was aware of the

25    suspect.  He uses his nickname, Jamichael Ramey's nickname,

1    as Bam, B-A-M.  He tells us that he knows about it.  He was

2    aware that Bam was at the same house Mr. Smith had just left

3    and said that he was aware that Bam had fled to either his

4    mother's house or Duluth.

5    Q.  After the transport that day Downtown, did you have any

6    further involvement in Mr. Smith's case?

7    A.  None.

8                MS. HUDLESTON:  Thank you.  Nothing further.

9                THE COURT:  All right.

10               THE WITNESS:  Thank you.

11               THE COURT:  Mr. Bruder, cross-examination.

12               MR. BRUDER:  Thank you, Your Honor.

13

14                        **CROSS-EXAMINATION**

15   **BY MR. BRUDER:**

16   Q.  Now, you were -- if I understand your testimony

17   correctly, Sergeant Schroeder, you were on alert on July

18   20th that your assistance might be needed to effect an

19   arrest, correct?

20   A.  Yes, sir.  That's accurate.

21   Q.  Okay.  And at some point you received a call that you

22   were to stop a vehicle and arrest the occupants of the car;

23   is that correct?

24   A.  That's correct, sir.

25   Q.  Okay.  And who was it that provided you with that

1    instruction?

2    A.  I believe it was the case agent, Officer Schmitt.

3    Q.  Okay.  Do you recall where you were when that call

4    arrived?

5    A.  No, not specifically, but I was in the area -- in the

6    immediate area as the surveillance officers were following

7    this suspect vehicle.

8    Q.  Okay.  And when you testified that you believed

9    Jamichael Ramey was in the vehicle, that was based on

10   information that was furnished to you by other police

11   officers, right?

12   A.  Exactly right, sir.

13   Q.  Prior to the time you stopped the vehicle, you were

14   behind the Envoy; is that correct?

15   A.  I was behind the Envoy for the amount of time it took me

16   to drive up behind it and turn our lights on.  That's it.

17   Q.  So before you stopped the vehicle, you never got a look

18   at either the driver or the passenger because you were

19   behind the vehicle?

20   A.  I never saw the driver.  I never saw the passenger.  I

21   never saw the vehicle.

22   Q.  Okay.  Once you stopped the vehicle, you approached it

23   from the passenger side and placed the defendant, Mr. Smith,

24   under arrest, correct?

25   A.  Exactly right, sir.

1    Q.  And I could certainly see that one of the other officers

2    had his gun drawn.  Your gun was drawn as well, correct?

3    A.  Certainly.

4    Q.  Because you considered this to be a high-risk arrest

5    based on your assumption that Mr. Ramey was in the

6    automobile and that he was a suspect in a shooting?

7    A.  Exactly right, sir.

8    Q.  Okay.  And if I understand it correctly from listening

9    to the video, Mr. Smith was asked first you've got -- Do you

10   have a gun on you and then later You got a banger on you,

11   Bro?  Did you hear those questions?

12   A.  That was after he told us he had a gun on him.

13   Q.  Okay.  And at that point, when a suspect is in a vehicle

14   carrying a gun and is being escorted out by police who ask

15   him if he has a gun, is it a good idea to be honest?

16   A.  I'm sorry, is it a good idea for a suspect to be honest?

17   Q.  When he's asked that question.

18   A.  That would be my opinion.  I would say yes, sir.

19   Q.  Okay.  Well, if he lies about having a gun and you find

20   a gun, you know, that could be a much more dangerous

21   situation.  Or if he is reaching for anything you think

22   might be a gun, that could be a very dangerous situation.

23   Correct?

24   A.  Yes, sir, I'd agree with that.

25   Q.  Okay.  Now, when you arrested Mr. Smith, it appears that

 1     you noticed pretty quickly he had a number of facial

 2     tattoos.

 3     A.  That's accurate.

 4     Q.  All right.  And that was something that you were able to

 5     pretty quickly recognize, correct?

 6     A.  Of course.  Yes, sir.

 7     Q.  And had you looked at a photograph of Mr. Ramey before

 8     you made this arrest?

 9     A.  Yes, sir.

10     Q.  And Mr. Ramey did not have any facial tattoos; is that

11     correct?

12     A.  That's accurate.

13     Q.  How about skin tone?  Was Mr. Ramey's skin tone similar

14     to Mr. Smith's or did it appear to be lighter or darker to

15     you?

16     A.  So from my training and experience, photos of people

17     often aren't super accurate.  From my recollection of this

18     incident, Mr. Smith's general appearance, including skin

19     color, tone, hair, body type, build all matched similar to

20     Mr. Ramey, other than the giant cross tattooed on his

21     forehead.

22     Q.  And later as the arrest unfolded, you participated in a

23     search of the vehicle, correct?

24     A.  Yes, sir.

25     Q.  And in the center console of the vehicle you found what

1    you believed were narcotics, correct?

2    A.  Correct, sir.

3    Q.  And those were -- the console lid was shut.  You had to

4    raise the lid to see inside, correct?

5    A.  That's correct, sir.

6    Q.  So if the lid was closed, anyone in the vehicle wouldn't

7    know that those narcotics were there?

8    A.  Of course.

9    Q.  And it looked like there were a number of other personal

10   items that were also in the console.  Did you see those?

11   A.  Yes.  I would agree with that statement, sir.

12   Q.  Are you aware of whether there was ever an effort to

13   identify who the owner of those personal items were?

14   A.  Like I testified before, sir, after dropping Mr. Smith

15   off at jail, I had no involvement in this case.

16   Q.  All right.

17           MR. BRUDER:  I have no further questions.  Thank

18   you, Officer -- or Sergeant.

19           THE WITNESS:  Thank you.

20           THE COURT:  Ms. Hudleston, anything further for

21   Sergeant Schroeder?

22           MS. HUDLESTON:  Briefly, your Honor.  Thank you.

23

24

25

1  **REDIRECT EXAMINATION**

2  BY MS. HUDLESTON:

3  Q.  Sergeant Schroeder, when Mr. Bruder asked you about

4  noticing facial tattoos right away, we saw in that video you

5  were right directly in front of Mr. Smith, right?

6  A.  Correct.

7  Q.  That's quite different than being far away in a

8  surveillance van; is that fair to say?

9  A.  Yes.

10  Q.  And it's easier to see certain things when you are up

11  close, to state the obvious?

12  A.  Yes, Ma'am.

13         MS. HUDLESTON:  Nothing further.

14         THE COURT:  Mr. Bruder, anything further?

15         MR. BRUDER:  I have nothing further.

16         THE COURT:  Sergeant Schroeder, you may step down.

17  Thank you.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  Ms. Hudleston, do you have any other

20  witnesses?

21         MS. HUDLESTON:  I do not, Your Honor.  That is the

22  entirety of my evidence.

23         THE COURT:  Mr. Bruder, do you intend to call any

24  witnesses or do you have any other exhibits to introduce?

25         MR. BRUDER:  Give me just a second.

1          THE COURT:  Of course.

2          (A brief discussion was held off the record.)

3          MR. BRUDER:  Your Honor, we do not have any

4     exhibits or any additional testimony.

5          THE COURT:  All right.  Well, that concludes the

6     evidence gathering part of this hearing.  Let's talk a bit

7     about a schedule for post-hearing briefing.

8          So, Mr. Bruder, I assume you are going to order a

9     transcript from our court reporter?

10          MR. BRUDER:  That is my plan, Your Honor.

11          THE COURT:  All right.  And are you going to be

12     looking for that transcript in seven days or 14 days or

13     something different?

14          MR. BRUDER:  I'm going to defer to the Court on

15     that one or I should say maybe the court reporter.

16          (A brief discussion was held off the record.)

17          THE COURT:  So if you can get your transcript in

18     seven days from the day you order it -- since today is

19     almost done, we'll say you will order it tomorrow -- how

20     long after you get the transcript would you need for a

21     brief?

22          MR. BRUDER:  Well, one would expect I would have a

23     lot of time, but for some reason I'm actually very busy

24     right now.  I'd ask for three weeks, Your Honor.

25          THE COURT:  That should be fine.  Let me do a

1    little bit of counting here.  So if you have your transcript

2    by the 26th, then that makes it -- it looks like that would

3    put you at June 16th for your brief.  Does that sound about

4    right?

5              MR. BRUDER:  That sounds fine, Your Honor.

6              THE COURT:  Ms. Hudleston, how long do you need

7    after that?

8              MS. HUDLESTON:  Gosh, Your Honor, it's been awhile

9    since I've done this.  My thought is maybe two weeks.  What

10   is the Court's standard briefing interval between?

11             THE COURT:  You know, I'm very flexible as long as

12   there's a good reason for the request.  So if you need a

13   couple of weeks, that would put you to June 30th, which is a

14   nice round number.  Does that work for you?

15             MS. HUDLESTON:  Yes.  That sounds good.  Thank

16   you, Your Honor.

17             THE COURT:  So briefing will be concluded as of

18   June 30th.  I'll take the matter under advisement at that

19   point.  And I'll get a report & recommendation out as soon

20   as I can after that.

21             So in terms of any other housekeeping,

22   Ms. Hudleston, you owe me a copy of Exhibit 13.  And will

23   you be dropping that off or having somebody drop that off on

24   a USB drive or something like that?

25             MS. HUDLESTON:  Yes, Your Honor, I believe that's

1     the best way to get it to you.

2              THE COURT:  All right.  Very well.

3              Ms. Hudleston, anything else we need to address

4     for the government this afternoon?

5              MS. HUDLESTON:  I don't think so, Your Honor.

6     Thank you.

7              THE COURT:  Mr. Bruder, anything else on behalf of

8     Mr. Smith?

9              MR. BRUDER:  There is not, Your Honor.

10             THE COURT:  All right.  Thank you.  We're

11    adjourned.

12             THE LAW CLERK:  All rise.

13             (Court adjourned at 4:19 p.m.)

14                    *      *      *

15        I, Debra Beauvais, certify that the foregoing is a

16    correct transcript from the record of proceedings in the

17    above-entitled matter.

18             Certified by:   *s/Debra Beauvais*
                               Debra Beauvais, RPR-CRR
19

20

21

22

23

24

25