UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Romelle Darryl Smith,<br><br>Defendant. | Case No. 20-cr-207 (JRT/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Defendant Romelle Smith's Motion to Suppress Statements, Admissions and Answers [ECF No. 28] and Motion to Suppress Evidence Derived from Search and Seizure [ECF No. 30]. The motions were referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. The Court held a hearing on the motions on May 18, 2021 [*see* ECF No. 64]. At the hearing, the Court heard testimony from Officer Jason Schmitt, Sergeant Adam Lepinski, and Sergeant Andrew Schroeder of the Minneapolis Police Department. The parties submitted post-hearing briefs on the Motion to Suppress Evidence.[1]  [ECF Nos. 71, 73.] The motions were taken

---

[1] At the hearing, counsel for Smith stated that the Motion to Suppress Statements was "encompassed" in the Motion to Suppress Evidence, such that there was no separate basis to suppress Smith's statements to officers beyond the alleged unlawfulness of the traffic stop. (*See* May 18 Hr'g Tr. at 4:12–5:17 [ECF No. 68].)

under advisement on June 30, 2021.[2]  For the reasons set forth below, the Court recommends that both motions be denied.

I.     Background

    A.    The Shooting in Powderhorn Park and the Cell Phone Tracking Warrant

On July 16, 2020, a person was shot in the head in Powderhorn Park in Minneapolis, Minnesota.  (May 18 Hr'g Tr. at 8:14–17.)  Officer Jason Schmitt of the Minneapolis Police Department was the case agent for the team investigating the incident.  (*Id.* at 7:15–8:19; 87:7.)  Through preliminary investigation, Officer Schmitt came to believe the shooting was done by Jamichael Ramey, a man who went by the name "Bam" and "operat[ed] . . . on the south side of Minneapolis."  (*Id.* at 8:22–9:11.)

Officer Schmitt had never met Ramey and did not know where he lived or worked. (*Id.* at 9:7; 17:16–20.)  He testified that on the day of the shooting, he checked Ramey's prior criminal records to see what addresses Ramey had previously reported to police and drove to those addresses hoping to spot Ramey, but did not otherwise attempt to determine whether they were still valid addresses for Ramey.  (*Id.* at 48:24–50:5.) Officer Schmitt also reached out to a confidential reliable informant ("CRI") to try to obtain Ramey's phone number.  (*Id.* at 9:10–15.)  Later that same day, the CRI contacted Officer Schmitt with a telephone number for Ramey and stated that s/he had "recently"— i.e., between the time Officer Schmitt initially reached out to the CRI and the time the CRI got back to him—spoken to Ramey at that number.  (*Id.* at 9:22–10:7.)  Officer

---

[2] The parties' non-dispositive motions were addressed in a separate Order. [ECF No. 60.]

2

Schmitt testified that he got the information from the CRI within five or six hours after the shooting. (*Id.* at 10:5–7.)

Based on the CRI's information, Officer Schmitt sought a warrant to track the location of the cell phone associated with that number. (*Id.* at 10:18–25.) A Hennepin County District Court judge issued the warrant on Thursday, July 16, 2020—the same day as the shooting. (*Id.* at 11:17–19.) The signed warrant was submitted to T-Mobile to authorize it to provide police with the cell phone's location information. (*Id.* at 11:9–13.) It took some time for T-Mobile to get the GPS tracking information to law enforcement, but Schmitt recalls that the phone's location information—emails every 15 minutes showing the phone's location within a specified radius—started coming in over the weekend. (*Id.* at 11:9–13; 13:24–14:6; 45:3–10.)

Officer Schmitt then developed an operations plan for arresting Ramey. (*Id.* at 11:20–22.) The plan included a short synopsis of the case and logistics information for the team of arresting officers, as well as information about Ramey's appearance. (*Id.* at 12:7–13; 14:22–15:12.) The plan described Ramey as a Black man, approximately 29 years old, 5'11" tall, and weighing 172 pounds. (*Id.* at 13:4–17; 14:22–15:6; Gov't Ex. 2.) It also included two photos of Ramey showing him with different hair styles, although Officer Schmitt testified that he does not "put a lot of stock into the description of a target's hair" since "[h]air and some other features can be easily modified." (May 18 Hr'g Tr. at 15:7–12; Gov't Ex. 2.) The operations plan included information about Ramey's criminal history in order to inform the arresting officers as to "what level of

3

violence" they might anticipate in apprehending Ramey. (May 18 Hr'g Tr. at 16:5–10.)

Officer Schmitt monitored the phone's location data over the weekend and noted that "the GPS was returning and staying near" a multi-unit apartment building at 5XXX 33rd Avenue South in Minneapolis. (*Id.* at 14:17–19; 16:25–17:5; *see* Gov't Exs. 11, 12.) On Monday, July 20, 2020, Officer Schmitt updated the operations plan to include the building's address. (May 18 Hr'g Tr. at 17:21–25.) Later that morning he and a team of officers set up surveillance around the apartment building. (*Id.* at 17:23–18:14.)

### B. Surveillance Efforts and the Traffic Stop

Initially, Officer Schmitt was the team's "eye"—the only officer with "direct surveillance" of the building—while the other officers remained farther away. (*Id.* at 18:15–23.) Officer Schmitt parked in an unmarked Chrysler minivan down the block from the apartment building, approximately 100–125 yards away, and used binoculars to observe the building and surrounding area. (*Id.* at 18:24–19:6; 22:14–15; 53:16–21.) He testified that he parked some distance away, rather than in front of the apartment building, in order to "maintain as low a visibility" as possible and since parking too close to the target building "can flag somebody to see that there's a car that doesn't belong in their neighborhood or that doesn't belong to the apartment building parked right in front." (*Id.* at 19:16–20:1.) However, the distance between Officer Schmitt's van and the apartment building meant that his view was partially obstructed by "trees, cars, [and] light poles." (*Id.* at 22:11–13.)

Officer Schmitt noted the vehicles that were parked in front of the apartment building, believing those to be the vehicles that "would most likely be associated with the

4

address." (*Id.* at 22:21–25.) One of those vehicles was a red GMC Envoy. (*Id.* at 23:1–7.) He also saw a person he believed might be Jamichael Ramey. (*Id.* at 23:9–11.) Specifically, Officer Schmitt saw a Black man in "what [he] considered a same age range" as Ramey walking around the area and going in and out of the apartment building. (*Id.* at 23:13–23; 54:8–10.) The man wore a black Adidas jacket with white stripes on the sleeve. (*Id.* at 23:15–19.) Officer Schmitt did not notice any tattoos on the man's face. (*Id.* at 23:24–24:1.) The man did not appear to Officer Schmitt to be "skulking around or hiding from people," nor did he appear to be "acting suspicious." (*Id.* at 54:14–21.) Meanwhile, Officer Schmitt continued to receive emails with "pings" showing the target phone's location in and around the area of 5XXX 33rd Avenue South. (*Id.* at 26:10–13.)

Eventually Officer Schmitt left his location and Sergeant Adam Lepinski took over as the "eye." (*Id.* at 24:2–7.) Like Officer Schmitt, Sergeant Lepinski parked his unmarked car some distance away from the apartment building to avoid being seen. (*Id.* at 69:25–70:13.) From his vantage point, Sergeant Lepinski could see the sidewalk and street in front of the building, but his view was also partially obscured. (*Id.* at 70:14–17; Gov't Ex. 12 (photo taken on May 17, 2021, from exact location where Lepinski was parked (*see* May 18 Hr'g Tr. at 69:15–20)).) Sergeant Lepinski observed a young Black man in a black Adidas jacket whose "physical build was similar to the suspect, Mr. Ramey, in terms of his weight, height, skin complexion, as well as his hair was similar." (May 18 Hr'g Tr. at 70:19–72:9; 76:24–77:1; 77:24–25; 78:18–19.) Sergeant Lepinski did not recall Officer Schmitt telling him to pay particular attention to a man wearing a black Adidas jacket. (*Id.* at 76:6–8; 78:20–23.) But like Officer Schmitt, he thought the

5

man might be Jamichael Ramey.  (*Id.* at 71:4–6.)  Sergeant Lepinski did not see any tattoos on the man's face.  (*Id.* at 71:25–72:1.)  He agreed, however, that his "ability to observe or identify [the man] was to some degree impeded by the distance" he was from the apartment building, as well as "by the fact that [he was] looking at it from an angle and there were trees and light poles and that sort of thing in the vicinity."  (*Id.* at 79:21–80:3.)

   Sergeant Lepinski observed the man leave the apartment building and stand on the sidewalk, walking back and forth for awhile, but did not see any behavior that he characterized as suspicious.  (*Id.* at 78:12–17; 79:12–17.)  He saw other people in the vicinity, but none that looked like Ramey.  (*Id.* at 76:14–19.)  At some point, another man, eventually identified as T.A., joined the man Officer Lepinski believed to be Ramey.  Sergeant Lepinski was not sure when or by what door T.A. had exited the apartment building.  (*Id.* at 78:24–79:14.)  Sergeant Lepinski watched as the man he thought was Ramey got into the passenger seat of the GMC Envoy, and the car drove away, with T.A. at the wheel.  (*Id.* at 70:22–25; 71:13–16; 78:24–79:5.)  He radioed the other members of the team that the man he thought was Ramey was leaving the area, and he provided details about the GMC Envoy.  (*Id.* at 72:8–15.)  Sergeant Lepinski remained parked outside the building while the other officers attempted to follow the GMC Envoy.  (*Id.* at 73:9–10.)

   The officers briefly lost sight of the GMC Envoy, but Sergeant Luke Peterson soon radioed that he had spotted it at a gas station at 60th Street and Portland Avenue.  (*Id.* at 27:4–6.)  Meanwhile, Officer Schmitt had continued to monitor the target phone's

location through the "ping" notifications. (*See id.* at 24:12–24.) In the period of time before the GMC Envoy drove away, he had lost the GPS location information for two 15-minute cycles—that is, two emails from the phone carrier reported the phone had an "unknown location."[3] (*Id.* at 24:23–25:2.) As a result, for a period of 45 minutes, Officer Schmitt did not have information about the phone's location. (*Id.* at 26:8–9.) Just before he lost the location information, the "ping" had showed the target phone in the area of the apartment building, with a five-meter error radius. (*Id.* at 45:3–10.) When the next "ping" came in 45 minutes later, shortly after the GMC Envoy drove away, it showed the phone had moved to the intersection of 60th Street and Portland Avenue. (*Id.* at 26:20–21.) Officer Schmitt testified that because the new "ping" location "validated [the officers'] belief that the phone left in that vehicle," they concluded Ramey was probably in the vehicle, and so decided to attempt to arrest him. (*Id.* at 27:8–12.) Officer Schmitt gave instructions over the radio for the officers to pull the GMC Envoy over. (*Id.* at 27:13–15.) As the officers got into position, the GMC Envoy drove north on Park Avenue. (*Id.* at 27:17–20.) Officers stopped it at the intersection of 42nd Street and Park Avenue. (*Id.*) Shortly thereafter, when the next GPS location email came in, it showed the target phone had moved to that location. (*Id.* at 28:18–23; Gov't Ex. 5 at 00:10–00:15.)

The GMC Envoy was stopped by officers in a marked police vehicle. (May 18

---

[3] Officer Schmitt testified that in his experience, GPS location is lost when the carrier's signal is unable to connect to the phone, such as when the phone is turned off or outside of a service area. (*Id.* at 25:23–26:4.)

7

Hr'g Tr. at 88:12–14; 89:4–7.) The officers approached the vehicle quickly and with guns drawn. (*Id.* at 90:2–3; Gov't Ex. 3a at 00:16–00:22.) Sergeant Andrew Schroeder and another officer pulled the man they believed to be Ramey from the passenger seat and asked him repeatedly if he was carrying a gun. (Gov't Ex. 3a at 00:38–00:58.) He ultimately acknowledged he had a gun in his pocket. (*Id.* at 1:57–2:20.) While the other officers handcuffed the passenger, Sergeant Schroeder went to the driver's side and assisted in handcuffing the driver, T.A. (*Id.* at 1:05–1:50.) Sergeant Schroeder then came back to the passenger as another officer retrieved a handgun from the passenger's right pocket. (*Id.* at 2:10–2:20.) At that point, Sergeant Schroeder asked the passenger his name and the man identified himself as Romelle Smith. (*Id.* at 2:20–26.) Sergeant Schroeder immediately relayed the information to Officer Schmitt, saying, "This is Romelle Smith. Uh—tattoo of a cross in between his forehead." (*Id.* at 2:25–2:32.) He went on, "I don't think this is your guy, Jay. Says his name is Romelle Smith, he's got tattoos all over his face, a cross in between his eyes." (*Id.* at 2:47– 2:55.) Officer Schmitt could then be heard over the radio saying, "Yeah—uh—don't think that's the right guy." (*Id.* at 2:59–3:03.)

     Smith was placed in the back of Sergeant Schroeder's squad car. (Gov't Ex. 4 at 3:06–3:32.) At some point, the officers learned that he had an outstanding felony warrant. (May 18 Hr'g Tr. 91:12–15.) The GMC Envoy was searched, and a plastic container with fourteen baggies of methamphetamine was found in the center console. (Gov't Ex. 3b at 00:03–00:15; Gov't Exs. 7, 8.) As a result, even though the officers had ascertained that Smith was not Ramey as they had initially believed, Smith was formally

8

arrested and transported to jail because of the gun, the drugs, and the outstanding warrant. (May 18 Hr'g Tr. at 31:10–32:12, 92:13–17; Gov't Ex. 8.)

Officer Schmitt later learned that the target phone he had been tracking in fact belonged to the driver of the GMC Envoy, T.A., and that T.A. was an associate of Ramey's. (May 18 Hr'g Tr. at 30:13–31:8.) Officer Schmitt testified he and other officers believe that Ramey had used T.A.'s cell phone for awhile, but that by the morning of July 20, the phone was back in T.A.'s possession. (*Id.*) Sergeant Schroeder testified that Smith told him during the ride to jail that Ramey had been staying at the apartment at 5XXX 33rd Avenue South but had fled. (*Id.* at 94:1–4; *see generally* Gov't Ex. 13 at 1:30–2:50.)

On September 17, 2020, Smith was federally charged as a felon in possession of a firearm. (Indictment [ECF No. 1].)

## II.     Discussion

### A.     The Motion to Suppress Evidence

Smith moves to suppress all evidence obtained as a direct consequence of the traffic stop—namely, the gun and any statements he made—on the ground that the police stop of the vehicle in which Smith was a passenger violated Smith's rights under the Fourth Amendment. As a threshold matter, Smith does not appear to dispute that the officers had probable cause to believe that Ramey was responsible for the July 16, 2020, shooting in Powderhorn Park, and that therefore they had probable cause to apprehend and arrest Ramey. Rather, he argues the information the officers had did not provide them sufficient grounds to believe Ramey was in the GMC Envoy, and therefore they

lacked sufficient grounds to effect the traffic stop that led to Smith's arrest. (Def.'s Mem. at 6 ("[T]he critical issue to be determined by the Court . . . depends on whether police had a particularized objective reason to believe that their target, Ramey, was in the vehicle.")).

The Court must first determine the standard to be applied in determining whether the officers' conduct passed constitutional muster. As Smith notes, the traffic stop of the GMC Envoy was "an investigatory stop designed to gather evidence and, hopefully, confirm the passenger's identity." (Def.'s Mem. at 5 [ECF No. 71].) "A law enforcement officer may conduct an investigative stop of a vehicle if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Phillips*, 679 F.3d 995, 997 (8th Cir. 2012) (citing *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012); *United States v. Sokolow,* 490 U.S. 1, 7 (1989); *Terry v. Ohio,* 392 U.S. 1, 30 (1968)) (internal quotations omitted). Specifically, in cases involving a motion to suppress evidence obtained as the result of a stop based on mistaken identity where the officers would have had the authority to seize and detain the man they were looking for, the Eighth Circuit has held that the "'validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one.'" *Phillips*, 679 F.3d at 998 (quoting *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005)); *see also United States v. Bobo*, 994 F.2d 524, 527 (8th Cir. 1993) ("[I]f the police had probable cause to arrest

Marvin, and they reasonably believed that the man driving the green Cadillac was Marvin, then Richard's arrest was a valid arrest.").

Here, it is not disputed that the police had probable cause to arrest Ramey, so if the officers reasonably believed Ramey was in the GMC Envoy, then the stop was a valid one. The question for this Court is whether, in light of the totality of the circumstances, police were objectively reasonable in mistaking the passenger in the GMC Envoy—Smith—for Ramey.

Officer Schmitt testified that he believed Smith was Ramey because Smith and Ramey were Black men in the same age range, he had reason to believe Ramey was using the target phone, the target phone was pinging at the apartment building where he first spotted Smith, and then it pinged at 60th and Portland where the GMC Envoy in which Smith was a passenger was spotted next. (May 18 Hr'g Tr. at 64:20–65:4.) Officer Lepinski testified that his belief that Smith was Ramey was based on the same information cited by Officer Schmitt, and also that the man he saw at the apartment was of similar (medium) build and had similar hair and complexion to Ramey. (*See id.* at 72:4–8; 73:11–13; 76:23–77:18; 78:6–7.)

There seems little question that if all police had to rely on when they decided to stop the GMC Envoy was their perception of a physical resemblance between Ramey and Smith, their decision would not have been objectively reasonable. The only thing Officers Schmitt and Lepinski could observe with any accuracy from their vantage points on surveillance more than 100 yards away was that the man they were watching was, like Ramey, a young Black man of medium build. (May 18 Hr'g Tr. at 54:22–55:6; 76:23–

11

77:1; 82:22–83:1.) Officer Schmitt acknowledged that while serving as the team's "main eye" he was not in a position to accurately compare height, weight, and complexion[4] (*id.* at 62:3–13), and Officer Lepinski acknowledged his "ability to observe or identify [the man] was to some degree impeded" both by distance and by obstacles in his line of sight (*id.* at 79:21–80:3). The differences between Smith and Ramey's physical appearances are evident in closer proximity, as can be seen by comparing the officers' body-worn camera footage with the photos of Ramey attached to the operations plan. Smith has darker skin and is four inches shorter and approximately 35 pounds lighter than Ramey. (*See* May 18 Hr'g Tr. at 47:23–48:12; Gov't Exs. 3a, 5.) Additionally, unlike Ramey, Smith has one or more tattoos on his face, although they are not prominent in the camera footage.[5] (May 18 Hr'g Tr. at 46:22–24; 96:25–97:3; *see generally* Gov't Exs. 3a, 3b, 5.)

But police had initially targeted the apartment building on 33rd Avenue South because they were tracking a phone they believed Ramey was using. During the weekend following the shooting and through the morning of Monday, July 20, the phone was shown to be at that apartment building. Then, the phone left the area of the apartment about the same time the GMC Envoy did, and appeared at 60th and Portland at the same time as the GMC Envoy was spotted at that same location. Thus, when the

---

[4] Sergeant Schroeder also testified that, in his experience, photographs of people are not always able to accurately convey a person's skin tone. (May 18 Hr'g Tr. at 97:13–21.)
[5] Smith also argues that his hair is close cropped while Ramey's hair in one of the two photos attached to the police operations plan is noticeably longer. On the other hand, the government points out that the other photo of Ramey shows a shorter hairstyle. In any event, Officer Schmitt testified that hairstyle was not significant to him because hair can be easily modified. (May 18 Hr'g Tr. at 15:7–12.)

officers stopped the GMC Envoy, it was not solely because Smith and Ramey were both young Black men of medium build but because the GPS data strongly suggested the phone they thought Ramey was using was in the car. In other words, Smith's movements matched the movements of what police understood to be Ramey's phone. The ping putting Smith and the phone at the gas station at 60th and Portland is particularly crucial. That piece of information "validated [the officers'] belief that the phone left in that vehicle"—on the person they believed to be Ramey—such that the officers could "enact the operations plan of arresting the target of [their] assault, Jamichael Ramey." (May 18 Hr'g Tr. at 27:8–12.) That is, although police thought Smith resembled Ramey, they did not act to arrest him until they received confirmation that Smith and the phone were linked.

It was thus eminently reasonable for the officers to believe that the person in possession of the target cellphone was in the GMC Envoy on July 20, 2021. The question, therefore, is whether it was objectively reasonable for them to believe the person in possession of the target phone that day was *Ramey*. Defendant attacks both the reliability of the source and the timeliness of the information that underlay that belief.

The officers' belief about Ramey's cellphone number was based on information from a known informant whom Officer Schmitt described as a "confidential reliable informant" or "CRI." Officer Schmitt had worked with the CRI on approximately 25 to 30 prior occasions, although he did not recall whether he had been told previously that the CRI was acquainted with Ramey. (*Id.* at 41:16–18; 42:1–2.) He testified that the CRI was typically paid for his/her services, and probably was paid on this occasion as well.

13

(*Id.* at 42:6–9.) Officer Schmitt did not recall whether the CRI had *ever* previously provided information that proved to be inaccurate (*id.* at 42:3–5), but the Court finds it reasonable to infer from the number of prior occasions on which Officer Schmitt had used the informant and his description of the informant as "reliable" that, at the very least, the informant's tips had *typically* proved to be accurate. Furthermore, the informant provided not only a telephone number for Ramey but also the additional specific information that s/he had spoken with Ramey at that number in the period between Officer Schmitt's call to the informant and the informant's call back to Officer Schmitt. *See United States v. Marchena-Borjas*, 209 F.3d 698, 700 (8th Cir. 2000) (affirming lower court's ruling that officers had probable cause to arrest suspect based in part on the specificity of detail provided by the confidential informant). Finally, the information supplied to the Hennepin County District Court judge about the connection between Ramey and that cellphone number had been sufficient for Officer Schmitt to obtain a cellphone tracking warrant. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 (1971) (the Fourth Amendment requires that, before a warrant can be issued, "the judicial officer issuing such a warrant [must] be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant"); *Lowrance v. Pflueger*, 878 F.2d 1014, 1020 (7th Cir. 1989) (arresting officers acted reasonably, in part, because they knew "that a warrant had issued for the [plaintiff's] arrest, from which they could infer that a neutral, detached judicial officer had reviewed the information and found probable cause"). The Court finds,

14

therefore, that it was reasonable for officers to believe that Ramey was in possession of the target cellphone on the day of the shooting.

Defendant suggests, however, that even if the information received was sufficiently reliable to justify the issuance of a warrant on July 16 to track the cellphone, police did not do enough to corroborate whether the number actually belonged to Ramey, and did not move quickly enough to have an objectively reasonable belief that the number would still be associated with Ramey on July 20, four days later. The Court disagrees. Officer Schmitt testified that as part of his initial investigation, he entered the phone number provided by the CRI into the CLEAR database in order to identify the phone carrier. (May 18 Hr'g Tr. at 43:19–23.) He acknowledged that the CLEAR database could have contained information as to the subscriber associated with that number but he could not recall if that information was available in this case or not. (*Id.* at 43:19–44:4.) But even if it was, given Officer Schmitt's relevant and timely information that his informant had talked with Ramey on the target phone within hours after the shooting, the Court cannot conclude Officer Schmitt's belief that the phone was in Ramey's possession, and that the same phone could lead them to Ramey less than four full days later, was unreasonable. Reasonable belief does not require certainty. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *see also United States v. Oliver*, Case No. 15-cr-164 (DSD/BRT), 2015 WL 13731345, at *8 (D. Minn. Oct. 13, 2015), *report and recommendation adopted*, 2015 WL 7432334 (Nov. 23, 2015) ("Probable cause, as its very name implies, deals with probabilities based on reasonable, commonsense inferences, not with certainties about the incriminating nature of items or whether they

15

are actually located in a particular place.").

Smith also argues the police failed to pursue several other avenues of investigation, such as monitoring the back door of the apartment building or attempting to contact Ramey at his previous addresses. (*See* Def.'s Mem. at 8–10.) But those arguments are entirely beside the point, since police reasonably believed they knew Ramey's location would be evidenced by the GPS tracking information from the cell phone. Once it became clear that the phone was traveling in the GMC Envoy, police were reasonable in ruling out that Ramey was still at the apartment building or anywhere other than in the vehicle they subsequently stopped.

Thus, given that it was objectively reasonable for the officers to believe that Ramey was in possession of the target cellphone, it was also objectively reasonable for them to believe that Smith—who, from their vantage point, was physically consistent with Ramey, and was moving from one location to another in tandem with the phone they thought Ramey was using—was in fact Ramey.

The Eighth Circuit has addressed similar situations to the one at issue here. In *United States v. Phillips*, police were looking for a man in connection with a recent shooting. 679 F.3d at 996. The investigating officers had a photograph of the suspect and knew that he was a Black man in his mid-thirties who was approximately six feet tall and 215 pounds, and bald. *Id.* The officers also had an address where they believed the suspect was staying. *Id.* While driving in the area near the address, police saw a man they believed was the suspect. *Id.* Police stopped the car in which the man was a passenger and asked the occupants for identification. *Id.* at 997. The man reached to get

16

his wallet in a way that the officer perceived to be "unnatural," which caused the officer to believe he was armed. *See id.* Although the man's I.D. revealed that he was Tony Phillips, not the suspect, the officer had stepped away from the car to "shield himself" in case the man produced a gun, so he could not be sure that the I.D. belonged to the man in the car. *Id.* The officer asked Phillips to step out of the vehicle and, as he did, asked whether the man had any weapons on him. *Id.* Phillips replied that he had a handgun in his pocket. *Id.* Once out of the car, the officer could confirm that the I.D. was valid and Phillips was not the suspect they were looking for, but Phillips was charged as a felon in possession of a firearm. *Id.*

On appeal, Phillips argued that the officer's mistaken identification was not objectively reasonable because the description and photo of the suspect "identified common physical characteristics" and because police had observed Phillips for too short a period and from too far a distance to accurately identify him. *Id.* at 998. The Eighth Circuit disagreed. It found that although the officer's "initial observation of Phillips was brief and from a distance," the officer had testified that he had gotten a "good enough look" to be convinced Phillips was the man they were after. *Id.* The Eighth Circuit held that the officer's mistake was objectively reasonable, since Phillips—a six-foot tall, two-hundred pound, thirty-eight year old, bald Black man—"closely matched [the suspect's] description" and he had been seen approaching the house where the suspect was believed to be staying. *Id.* As a result, the court concluded the evidence obtained during the investigative stop should not be suppressed. *Id.*

In this case, as in *Phillips*, the Court must consider whether the officers' actions

17

were permissible under the circumstances reasonably known to the officers at the time. *See Smart*, 393 F.3d at 770; *see also United States v. Farnell*, 701 F.3d 256, 262 (8th Cir. 2012) ("[A] person's physical appearance and location relative to a known crime scene can provide an objectively reasonable basis for an officer to stop that person, even where the officer's observation of the person is brief and from a distance. . . ."). The Court concludes that, given the totality of the circumstances, the officers were reasonable in their belief that Smith was Ramey, and their traffic stop of the GMC Envoy was constitutionally permissible.[6] The "harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity." *Davis v. United States*, 564 U.S. 229, 241 (2011) (internal quotations omitted).

Accordingly, the Court recommends Smith's motion to suppress the evidence discovered during his arrest be denied.

### B.    The Motion to Suppress Statements

Smith also filed a motion to suppress statements he made to police at the time of his arrest. At the motion hearing, counsel for Smith stated that the Motion to Suppress Statements was "encompassed" in the Motion to Suppress Evidence, such that there is no separate basis to suppress Smith's statements to officers beyond the alleged unlawfulness of the traffic stop. (*See* May 18 Hr'g Tr. at 4:12–5:17.) Since the Court has concluded

---

[6] Apart from whether the police had a reasonable basis to conduct the traffic stop in the first instance, Smith does not argue the police were unjustified in *how* they conducted the stop, i.e., in removing Smith from the vehicle, inquiring about weapons, handcuffing him after they learned of the gun, and taking him into custody when they learned of the outstanding warrant for his arrest.

the traffic stop was lawful, there is no independent basis to suppress Smith's statements to officers. Accordingly, Smith's motion to suppress his statements should also be denied.

### III.   Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Romelle Darryl Smith's Motion to Suppress Statements, Admissions and Answers [ECF No. 28] and his Motion to Suppress Evidence Derived from Search and Seizure [ECF No. 30] be **DENIED.**

Dated: July 22, 2021

*s/ Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.